# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| JANINE ALI, | Case No. 1:14cv-01615-AJT-JFA |
| Plaintiff, | Hon. Anthony J. Trenga |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF INDIANA PURSUANT TO 28 U.S.C. § 1404(a)** |
| ELI LILLY AND COMPANY, an Indiana corporation, | |
| Defendant. | |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS...................................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................................. ii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND ............................................................................................................................. 4

    I.    The Cymbalta Litigation:  What These Cases Are About ................................................. 4

    II.   The Cymbalta Litigation:  The History of the Litigation and Previous Efforts to Centralize and/or Coordinate ......................................................................................... 8

    III.  Status of this Case............................................................................................................ 14

ARGUMENT ................................................................................................................................ 14

    I.    The Plaintiff's Choice of Venue Is the Southern District of Indiana ............................. 15

    II.   Transfer to the Southern District of Indiana, Where Lilly is Headquartered, Is More Convenient for *Both* Parties........................................................................................... 16

    III.  Transfer to the Southern District of Indiana Will Significantly Promote Judicial Economy and the Interests of Justice............................................................................... 19

    IV.  Transfer to the Southern District of Indiana Would Not, on the Whole, Inconvenience Potential Witnesses........................................................................................................... 21

CONCLUSION.............................................................................................................................. 23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allen v. Scribner,*
  812 F.2d 426 (9th Cir. 1987) ................................................. 19

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,*
  134 S. Ct. 568 (2013)................................................. 15, 21

*Bd. of Trustees v. Sullivant Ave. Properties, LLC,*
  508 F. Supp. 2d 473 (E.D. Va. 2007) ................................................. 15

*Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Boeser, Inc.,*
  No. 1:14CV1458 JCC/TC, 2015 WL 402992 (E.D. Va. Jan. 28, 2015)................................................. 15

*Bluestone Innovations, LLC v. LG Electronics, Inc.,*
  940 F. Supp. 2d 310 (E.D. Va. 2013) ................................................. 16, 20

*Byerson v. Equifax Info. Servs., LLC,*
  467 F.Supp.2d 627 (E.D. Va. 2006) ................................................. 19, 20, 21

*Coffey v. Van Dorn Iron Works,*
  796 F.2d 217 (7th Cir. 1986) ................................................. 19

*Commodity Futures Trading Comm'n v. Savage,*
  611 F.2d 270 (9th Cir. 1979) ................................................. 19

*Cont'l Grain Co. v. The FBL-585,*
  364 U.S. 19 (1960)................................................. 2, 15

*Heinz Kettler GMBH & Co. v. Razor USA, LLC,*
  750 F. Supp. 2d 660 (E.D. Va. 2010) ................................................. 19, 20

*Hill et al v. Eli Lilly and Company,*
  15-CV-141-LJM-DKL (S.D. In.)................................................. 2, 19

*In re Cymbalta (Duloxetine) Products Liab. Litig.,*
  MDL NO. 2576, 2014 WL 7006713 (J.P.M.L. Dec. 10, 2014)................................................. 1, 11, 12

ii

*In re Paxil Products Liab. Litig.*,
    296 F. Supp. 2d 1374 (J.P.M.L. 2003) ............................................................. 1, 10

*In re Vioxx Products Liab. Litig.*,
    439 F. Supp. 2d 640 (E.D. La. 2006) .................................................................... 23

*Jaffe v. LSI Corp.*,
    874 F. Supp. 2d 499 (E.D. Va. 2012) .................................................................... 21

*James v. Georgia Pac.*,
    No. 5:05CV931, 2005 WL 2978756  (N.D. Ohio Nov. 2, 2005) ............................ 16

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000) ................................................................... 13, 14, 22

*Matthews v. Whitewater W. Indus., Ltd.*,
    No. 11-24424-CIV, 2012 WL 1605184 (S.D. Fla. May 8, 2012) ........................... 16

*McDowell v. Eli Lilly & Co.*,
    No. 13 CIV. 3786, 2014 WL 5801604 (S.D.N.Y. Nov. 7, 2014) ........................... 20

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ............................................................................................ 20

*Pragmatus AV, LLC v. Facebook, Inc.*,
    769 F. Supp. 2d 991 (E.D. Va. 2011) .............................................................. 16, 17

*Ramsey v. Fox News Network, LLC*,
    323 F. Supp. 2d 1352 (N.D. Ga. 2004) ................................................................ 16

*Regents of the Univ. of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997) ........................................................................... 19

*Saavedra v. Eli Lily & Co.*,
    No. 2:12-CV-9366-SVW-MAN, 2013 WL 6345442 (C.D. Cal. Feb. 26, 2013) ...... 9

*Samsung Electronics Co. v. Rambus, Inc.*,
    386 F. Supp. 2d 708 (E.D. Va. 2005) ............................................... 16, 19, 21, 23

*Van Dusen v. Barrack*,

　376 U.S. 612 (1964) ................................................................................ 2, 15, 19, 24

**Statutes**

21 U.S.C. § 1390 ................................................................................................ 14, 15

28 U.S.C. § 1332 ...................................................................................................... 15

28 U.S.C. § 1391 ................................................................................................ 14, 17

**28 U.S.C. § 1404** ........................................................................................... passim

**Rules**

Fed. R. Civ. P. 26 .................................................................................................... 14

Fed. R. Civ. P. 4 ...................................................................................................... 14

Fed. R. Civ. P. 43 .................................................................................................... 23

Fed. R. Civ. P. 45 .................................................................................................... 22

## INTRODUCTION

Plaintiff moves to transfer venue to the Southern District of Indiana, the district where Defendant Eli Lilly and Company ("Lilly") is headquartered.  The purpose of transfer is to allow this case to proceed in a venue with other Cymbalta withdrawal[1] cases.[2]  This lawsuit was filed in anticipation of a multidistrict litigation ("MDL").  Undersigned counsel represents over 2,700 Cymbalta withdrawal victims[3] around the United States and reasonably expected that all cases, including this one, would be litigated in a centralized proceeding—an approach that was successful in *In re Paxil Prods. Liab. Litig.*, 03-ML-1574 (C.D. Cal.),[4] where over 3,000 similar claims involving Paxil withdrawal were successfully resolved through the MDL process. Plaintiff never intended to saddle this Court, or dozens of courts around the country, with overseeing litigation on the same issues.

Lilly, however, opposed the creation of an MDL, arguing that the litigation could be coordinated using informal coordination.  *See In re Cymbalta (Duloxetine) Products Liab. Litig.*, MDL NO. 2576, 2014 WL 7006713, at *1-2 (J.P.M.L. Dec. 10, 2014).  This opposition was part of an overall strategy to dissuade future litigants.  Lilly seeks to make the Cymbalta withdrawal litigation as difficult and expensive as possible so that future plaintiffs are deterred from pursuing legal recourse.  Centralization within *any* court undermines this strategy because it makes litigation *more* efficient and *less* expensive.

Following the denial of the MDL, Plaintiff's counsel faced a logistical nightmare.  Not only do the forty-seven cases currently on file, including this one, need to be individually litigated in

---

[1] Cymbalta withdrawal refers to those personal injuries patients sustain while attempting to discontinue the prescription drug Cymbalta, manufactured by the Defendant Eli Lilly and Company.

[2] This case is one of forty-seven similarly-situated cases involving Cymbalta withdrawal filed in twenty-nine different federal courts around the country.  A list of these cases is attached as Exhibit A to Wisner Decl.  This motion is being filed or will be filed in all related cases as part of an effort to centralize this litigation in the Southern District of Indiana.

[3] In addition, *at least* three other unaffiliated law firms have amassed inventories of over 1,500 cases.

[4] *See also In re Paxil Products Liab. Litig.*, 296 F. Supp. 2d 1374, 1375 (J.P.M.L. 2003).

twenty-nine different courts across the country—needlessly consuming judicial resources and forcing each plaintiff to bear costs that could have been shared in an MDL—but the 2,700+ cases in the pipeline are left without a central forum to be litigated.[5]  And, absent some form of centralization, individually litigating this volume of cases is impossibly burdensome.  As discussed below, Plaintiff's counsel explored informal ways to address this logistical problem with Lilly, but Lilly, consistent with its overall strategy, rejected every proposal.

Thus, without a transfer order putting all cases in an MDL, the only way to centralize this litigation is to file all future cases in the single venue that has both personal jurisdiction and venue over any claim against Lilly, i.e., the Southern District of Indiana.  Cases are already being filed there.  *See, e.g.*, *Hill et al v. Eli Lilly and Company*, 15-CV-141-LJM-DKL (S.D. In.) (filed February 2, 2015).  By filing cases in a single district, consolidation before a single judge is possible, creating a *de facto* MDL.  This reduces costs, streamlines the litigation, and gives every victim of Cymbalta withdrawal a realistic opportunity to have their day in court.  Cases can be resolved, one way or the other, on the merits, without getting mired down in logistics.  More importantly, this approach reduces the number of *different* courts around the country overseeing these cases, unburdening an already overburdened judiciary.

As part of this centralization effort, Plaintiff seeks to transfer *this* case to the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a).  This case is in the early stages of litigation.  The complaint was recently served and barely any discovery has occurred.  Transfer at this point would not prejudice either party.  More importantly, the purpose of a Section 1404(a) transfer is "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense[.]"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960)).  That purpose is

---

[5] This does not include the 1,500+ cases other law firms have amassed.

effectuated by transfer.

*First*, transfer will save the litigants needless expense.  For the Plaintiff, transfer allows the Plaintiff to share common costs with other plaintiffs litigating the same issues in the same court. This means, if successful, a larger portion of any settlement or judgment goes into the Plaintiff's pocket.   For Lilly, transfer also reduces expenses.  Instead of having to travel around the country litigating individual cases in different courts, Lilly will need to travel *1.5 miles* to litigate *all* cases before a *single* court in its hometown.  It is difficult to imagine a more convenient venue for Lilly to litigate these claims.

*Second*, transfer promotes judicial efficiency and protects the public interest.  As it stands, without any transfer, twenty-nine *different* courts will oversee forty-seven cases that allege nearly identical claims.  This is a waste of judicial resources.  Transfer of this case to the Southern District of Indiana will result in this Court not having to do work that another court will already be doing.  And, if all courts transfer these actions, a significant amount of time and money will be saved by the federal court system.  This, by definition, protects "the public against unnecessary inconvenience and expense[.]"  *Id.*

Plaintiff originally proposed dismissing this case without prejudice and re-filing it in the Southern District of Indiana, provided Lilly would agree to toll the applicable statute of limitations.  This would have obviated the need to file this motion.  Lilly, however, rejected the proposal for strategic reasons—reasons that come at the expense of the litigants and judiciary.

The transactional costs of seeking justice should not be used to thwart a decision on the merits.  Making this litigation "too expensive to pursue" is a bully tactic.  And, while Lilly can weather an expensive litigation, that fact should not be used to undermine the ability of people hurt by Cymbalta withdrawal to vindicate their rights.  Transfer and centralization will reduce

costs, save judicial resources, and allow the litigants to get to the merits of these cases as opposed to being bogged down in logistics. Transfer of this case to the Southern District of Indiana under 28 U.S.C. § 1404(a) is appropriate and warranted.

**BACKGROUND**

**I.    The Cymbalta Litigation:  What These Cases Are About**

Cymbalta is an antidepressant in a class known as selective serotonin and norepinephrine reuptake inhibitors ("SNRIs"). This lawsuit centers on a phenomenon called "withdrawal"—the physical and mental effects patients suffer when they stop taking Cymbalta.[6] The term "withdrawal" is deliberate. The physical effects patients experience upon stopping Cymbalta mirror those that drug addicts experience when they stop a narcotic: dizziness, headaches, nausea, diarrhea, excessive sweating, sensory disturbances, nightmares, and insomnia. However, in addition to these "typical" withdrawal effects, patients stopping Cymbalta also experience side effects that are unique to antidepressants: electronic shock sensations in the brain, loss of motor functions, seizures, extreme mood swings, depression (even if the patient never previously suffered from depression), emotional outbursts, and suicidal behavior / attempts. And, since prolonged use of Cymbalta can cause lasting changes to a brain's architecture and undermine its ability to reuptake neurotransmitters (a phenomenon known as "down regulation"), withdrawing from Cymbalta can last months or even years. For others, the withdrawal effects are so severe that patients are forced to continue on Cymbalta indefinitely.

It is widely accepted that an antidepressant's withdrawal risk is associated with the drug's

---

[6] SNRIs are a class of drugs that suppress the reuptake of the neurotransmitters serotonin and norepinephrine in a person's brain cells. This results in an abundance of serotonin and norepinephrine in the synaptic cleft. This is in contrast to selective serotonin reuptake inhibitors (SSRIs), such as Prozac, Paxil or Zoloft, which only suppress the reuptake of serotonin. SNRIs were originally developed to treat mood disorders, such as depression and anxiety, but have in more recent years been used to treat pain and fibromyalgia. The exact mechanism of action for all SNRIs and SSRIs is unknown, a fact reflected in each drugs' label.

half-life, i.e., the amount of time for half of a drug to leave a patient's system.  The shorter a

drug's half-life, the faster the drug leaves the patient's body.  This rapid depletion, in turn, leads

to more pronounced withdrawal symptoms.

Much of the research about the relationship between half-life and withdrawal was

conducted by Lilly as part of Lilly's efforts to bolster sales of the antidepressant Prozac in the

1980s and 1990s.  Lilly wanted to position Prozac as being superior to its competitors Zoloft and

Paxil by marketing Prozac's longer half-life as having a superior withdrawal profile.  Prozac has

a half-life of approximately 6 days.  Zoloft and Paxil's are 26 and 21 hours respectively.   Lilly

sponsored clinical trials to measure antidepressant withdrawal in Prozac, Paxil, and Zoloft, and

published these studies in medical journals.  The articles espoused Prozac's superior withdrawal

profile over Zoloft and Paxil, crediting Prozac's long half-life as the reason.

Thus, when it came to Cymbalta, Lilly had a problem.  Lilly knew the drug posed a serious

withdrawal risk.  Not only is Cymbalta's half-life only twelve hours—half the length of Paxil or

Zoloft—Lilly's own clinical data revealed that a large percentage of Cymbalta users who

stopped the medication suffered serious withdrawal symptoms.  Specifically, Lilly's data showed

that approximately **45% of patients** who stopped taking Cymbalta following completion of

placebo-controlled trials spontaneously[7] reported withdrawal symptoms.  Of these, 50.6% were

moderate, 9.6% were severe, and 53.7% remained unresolved after two-weeks.  For patients who

stopped Cymbalta after an open-label trial—the situation that most closely approximates a

typical patient's experience of taking a drug—**over 50% of patients** spontaneously reported

withdrawal symptoms.  Of these, 46.3% were moderate, 17.2% were severe, and 55.2% had not

---

[7] Use of the word "spontaneously" is deliberate.  Lilly researchers did not use a systematic
checklist for measuring withdrawal symptoms during the trials, but instead relied on volunteered
reports from participants.  Lilly researchers acknowledge that use of a symptom check list would
have resulted in an increased incidence rate.

resolved after two weeks.  That means, on average, 8.6% (50% of 17.2%) of patients that

knowingly stop Cymbalta experience *severe* withdrawal reactions.

However, despite having clear knowledge of Cymbalta's serious withdrawal risks, Lilly did

not adequately warn about this risk in its labeling.  When Cymbalta came on the market in 2004,

the label for Cymbalta under "Discontinuation of Treatment with Cymbalta" stated:

> Discontinuation symptoms have been systematically evaluated in patients taking
> Cymbalta.  Following abrupt discontinuation in placebo controlled clinical trials
> of up to 9-weeks duration, the following symptoms occurred **at a rate greater
> than or equal to 2%** and at a significantly higher rate in duloxetine-treated
> patients compared to those discontinuing from placebo: dizziness; nausea;
> headache; paresthesia; vomiting; irritability; and nightmare.
>
> During marketing **of other SSRIs and SNRIs** (Serotonin and Norepinephrine
> Reuptake Inhibitors), there have been spontaneous reports of adverse events
> occurring upon discontinuation of these drugs, particularly when abrupt, including
> the following: dysphoric mood, irritability, agitation, dizziness, sensory
> disturbances (e.g. paresthesias such as electric shock sensations), anxiety,
> confusion, headache, lethargy, emotional liability, insomnia, hypomania, tinnitus,
> and seizures.  Although these events are generally self-limiting, some have been
> reported to be severe.
>
> Patients should be monitored for these symptoms when discontinuing treatment
> with Cymbalta.  A gradual reduction in the dose rather than abrupt cessation is
> recommended whenever possible.  If intolerable symptoms occur following a
> decrease in the dose or upon discontinuation of treatment, then resuming the
> previously prescribed dose may be considered.  Subsequently, the physician may
> continue decreasing the dose but at a more gradual rate.[8]

This warning is materially deficient and misleading.  It fails to provide *meaningful* warning

about the **frequency**, **severity**, and **duration** of Cymbalta withdrawal—information Lilly

possessed from its Cymbalta trials but never disclosed:

- **Frequency:**  The warning suggests that the withdrawal risk is rare, occurring "at a rate
  greater than or equal" to 1 or 2%, even though the actual rate of patients experiencing

---

[8] In later years, the language under this section changed, and the phrase "greater than or equal to
2%" was changed to "greater than or equal to 1%" and then, most recently, to "greater than 1%."
Also, various withdrawal side effects were added and/or removed from the label over time.  In all
other material respects, however, the Cymbalta label did not change.

withdrawal is *at least* 45%.  Indeed, the data from Lilly's Cymbalta trials reveals, with statistically significant results, that in comparison to stopping a placebo, stopping Cymbalta elevated the risk of specific symptoms by as much as twenty-three times.

- **Severity:** The warning label does not provide accurate information about the severity of Cymbalta withdrawal, omitting the fact that, in Lilly's Cymbalta trials, between 9.6% and 17.2% suffered *severe* withdrawal and approximately 50% suffered moderate withdrawal.  Instead, the label misleadingly states, with regard to SSRIs and SNRIs in general, that withdrawal events "are generally self-limiting," and "some have been reported to be severe."  This waxes over Cymbalta-specific risks and incorrectly suggests that Cymbalta is comparable to other drugs in its class—a fact that is demonstrably false.  The label also does not mention the likelihood of a patient suffering from moderate withdrawal.

- **Duration:** The warning label does not discuss the anticipated duration of Cymbalta withdrawal.  In Lilly's Cymbalta trials, over 50% of those who suffered from withdrawal lasted longer than two weeks.  Nonetheless, Lilly makes no mention of any anticipated duration, stating, instead that withdrawal events were "generally self-limiting."  This falsely gives the impression that the duration of withdrawal is limited and/or relatively short.

This label is in stark contrast to the Cymbalta label in Europe.  The European label states that "[i]n clinical trials adverse events seen on abrupt treatment discontinuation occurred in approximately 45% of patients treated with Cymbalta[.]"  There is no "greater than or equal to" malarkey.  Moreover, the European label warns that "in some patients [withdrawal] may be severe in intensity."  There is no attempt to couch severity within a general warning about all SSRIs or SNRIs.  The European label also warns that withdrawal symptoms "may be prolonged (2-3 months or more)."  Nowhere in the U.S. label is there a warning about duration.  Finally, the European label provides instructions on how to taper, stating that Cymbalta "should be gradually tapered when discontinuing treatment over a period of no less than 2 weeks."  Again, the U.S. label makes no mention of how long Cymbalta should be tapered, and only provides that, if "intolerable symptoms occur . . .  resuming the previously prescribed dose may be considered."  The European label reveals that Lilly understood the importance of Cymbalta's high withdrawal rate.  That it chose not to provide this information to U.S. patients speaks volumes.

This lawsuit also alleges that the Cymbalta drug, itself, is defectively designed.  Cymbalta comes in 20mg, 30 mg, or 60 mg capsules.  Due to the short half-life of Cymbalta, the drug must be dispensed in an enteric-coated (delayed release) capsule.  And, to ensure that the enteric coating of the Cymbalta capsule is not compromised, the Cymbalta label instructs patients that the Cymbalta capsule is to "be swallowed whole and should not be chewed or crushed, nor should the contents be sprinkled on food or mixed with liquids."  Thus, unlike other medications which are manufactured as scored tablets that can be easily divided to create smaller doses, the smallest possible dose for Cymbalta is 20 mg, swallowed whole.  In the context of withdrawal, this poses a problem.  The Cymbalta label recommends tapering off the medication gradually, but practically, the patient will eventually have to quit taking Cymbalta at a 20 mg dose, without any gradual tapering. [9]  Patients prescribed the 20 mg dose are not able to taper whatsoever.  Thus, the actual design of the Cymbalta pill prevents the gradual tapering needed to safely discontinue Cymbalta.  Had Lilly developed smaller doses, i.e., tapering doses, or designed the Cymbalta capsule in a way that allowed a gradual reduction of doses below 20 mg, certain patients may not have suffered from the debilitating effects of withdrawal.

This lawsuit, thus, alleges personal injuries caused by Lilly's failure to adequately warn about the withdrawal risks of Cymbalta and by Lilly's failure to design a Cymbalta pill that could, in accordance with the labeling, be safely discontinued.

## II.   The Cymbalta Litigation:  The History of the Litigation and Previous Efforts to Centralize and/or Coordinate

By this motion, Plaintiff seeks to transfer her case to the Southern District of Indiana, the district where Lilly is headquartered and where future cases will be filed.  Centralizing this case

---

[9] Lilly may argue that a patient could take a 20 mg dose every other day.  That approach, however, does not help with Cymbalta withdrawal and, in fact, may exacerbate it since Cymbalta's half-life is approximately twelve hours. , Taking a dose every other day would amount to repeatedly starting and abruptly stopping Cymbalta, prolonging and exacerbating withdrawal symptoms.

with other cases alleging nearly-identical claims against Lilly is more efficient, cost-effective, and just.  However, to understand why Plaintiff did not file suit in the Southern District of Indiana at the outset, some background is required.

The history of this litigation starts with the class action *Saavedra v. Eli Lilly and Company*, 12-CV-9366 (C.D. Cal.), filed in late 2012.  In *Saavedra*, several plaintiffs, represented by three separate firms, including undersigned counsel, brought a consumer class action lawsuit against Lilly, alleging that Lilly violated the consumer protection law of various states by failing to disclose material information about Cymbalta to consumers, i.e., the frequency, severity, and duration of withdrawal.  *See Saavedra v. Eli Lily & Co.*, No. 2:12-CV-9366-SVW-MAN, 2013 WL 6345442, at *1-2 (C.D. Cal. Feb. 26, 2013).  This was the first lawsuit that had anything to do with Cymbalta withdrawal, although it was not "focused" on personal injuries.[10]

The *Saavedra* action prompted many individuals who had suffered from personal injuries associated with Cymbalta to contact Plaintiff's counsel.  Subsequently, in early 2013, the law firm of Pogust Braslow & Millrood ("PBM") filed seven personal injury claims against Lilly arising from Cymbalta withdrawal.  In addition to these seven suits, PBM entered into several tolling agreements with Lilly for other cases.  Of these seven, two were voluntarily dismissed, two were dismissed on summary judgment, and the remaining three are approaching trial—two (*Herrera* and *Hexum*) will go to trial in the Central District of California in May 2015, and last (*Seagroves*) will go to trial in the District of Arizona later this year.

By mid-2014, Plaintiff's counsel had received thousands of inquiries from individuals

---

[10] One of the named plaintiffs in *Saavedra* also alleges personal injuries in addition to coming forward as a putative class representative.  The personal injury component of the *Saavedra* action, however, has not been litigated beyond a motion to dismiss (which was denied).  *See Saavedra v. Eli Lily & Co.*, No. 2:12-CV-9366-SVW-MAN, 2013 WL 6345442, at *6 (C.D. Cal. Feb. 26, 2013).

seeking representation for claims arising out of Cymbalta withdrawal.[11]   With such a volume of

cases, it became clear that the best way to proceed was to request a multidistrict litigation

("MDL") proceeding—a single forum where all claims could be filed, organized, worked up, and

adjudicated by a judge who could oversee all aspects of the cases.  This approach had been

successful in *In re Paxil Prods. Liab. Litig.*, 03-ML-1574 (C.D. Cal.), where over 3,000 similar

personal injury claims involving Paxil withdrawal were resolved through the MDL process.[12]

In early August 2014, undersigned counsel and PBM filed an additional 23 personal injury

cases—including this case—around the country involving Cymbalta withdrawal.  These cases

were filed in the plaintiffs' home jurisdictions with an expectation that an MDL would be formed

due to the sheer volume of cases and in response to Lilly's refusal to allow additional tolling

agreements.  A few days later, a motion to create an MDL was filed with the Judicial Panel on

Multidistrict Litigation ("JPML").  The motion sought to centralize all Cymbalta withdrawal

litigation in the Central District of California, the venue with the largest number of cases and the

most mature dockets.  A copy of the motion is attached as Exhibit B to the Wisner Declaration.

While the motion was pending before the JPML, sixteen additional were filed, also in

anticipation of the MDL.

Lilly opposed the creation of an MDL, arguing that centralization would prevent Lilly from

asserting individual defenses.  A copy of Lilly's opposition to transfer is attached as Exhibit C to

the Wisner Declaration.  Lilly also incorrectly argued that discovery in the two cases in the

Central District of California was finished and, thus, pretrial coordination for common discovery

in the remaining cases would be unnecessary.  Plaintiff, along with the other plaintiffs requesting

---

[11] To date, counsel has been retained by over 2,700 individuals to investigate and potentially pursue Cymablta withdrawal personal injury claims.  In addition, the several other law firms have, *independently*, been retained by over 1,500 clients to investigate and pursue Cymbalta withdrawal claims.
[12] Undersigned counsel at Baum, Hedlund, Aristei & Goldman, PC, were lead counsel in *In re Paxil*.

an MDL, strongly disagreed with this characterization.  A copy of the reply brief is attached as

Exhibit D to the Wisner Declaration.  Plaintiff argued that centralization would not jeopardize

any individual defenses and would, in fact, allow for a uniform application of those defenses by

the *same* court—not potentially conflicting decisions by different courts.  Plaintiff also argued

that, despite Lilly's bald assertions to the contrary, there was a serious dispute about general

causation and whether the labeling for Cymbalta is misleading or inadequate.  Finally, Plaintiff

noted that the discovery produced in the Central District of California cases was *grossly*

deficient.  For instance, Lilly responded to many of the document requests by stating it was only

producing "examples" of responsive documents.[13]  Lilly did not even produce the entire

regulatory file for Cymbalta or any significant internal communications about the development

and creation of the Cymbalta label.  And, in total, only six Lilly depositions were taken (three of

which were 30(b)(6) depositions) in the earlier-filed cases, a fraction of the number normally

taken in a complex pharmaceutical case such as this.  Due to the very short discovery period

designated by the California Central District trial judge, the plaintiffs were unable to correct

these discovery deficits within the court's schedule.  Substantial discovery therefore remains to

be completed.

Despite these discovery issues and notwithstanding the fact that thousands of cases were in

the pipeline, the JPML decided against creating an MDL.  *See In re Cymbalta (Duloxetine)*

*Products Liab. Litig.*, MDL NO. 2576, 2014 WL 7006713, at *1-2 (J.P.M.L0. Dec. 10, 2014).

The JPML acknowledged that "these actions share factual issues concerning Cymbalta's

development, marketing, labeling, and sale" and that "[t]he actions in this docket are highly

similar."  *Id.* at *1. However, the JPML did not believe an MDL was appropriate, reasoning (1)

---

[13] Also, the Central District of California plaintiffs did not conduct any discovery on the design defect claim alleged in this case and the other forty-nine cases that are the subject of this motion.

that the procedural posture of the cases was too diverse, i.e., the earlier-filed cases were too far along and the later-filed cases (including *this* case) were "in their infancy," (2) that "most, if not all, of the common discovery has already taken place in those earlier-filed actions" even though "plaintiffs dispute the adequacy of Lilly's production," and (3) that the relatively few number of plaintiff's firms involved allowed for voluntary coordination.  *Id.* at *1-2.[14]

The JPML's refusal to create an MDL meant that the cases pending around the country were going to proceed separately in twenty-nine different courts.  Faced with this logistical quagmire, plaintiffs' counsel sent a letter to Lilly proposing informal coordination consistent with what Lilly asserted to the JPML Panel.  Plaintiffs' counsel proposed entering into a tolling agreement for the non-filed cases, allowing the parties to focus on the already filed cases:

> [A]s we have represented to both Lilly and the JPML, our firms have amassed hundreds—indeed, now thousands—of potential Cymbalta withdrawal plaintiffs. . . [I]n light of Mr. Imbroscio's representation to the JPML about engaging in informal coordination, we would like to explore the prospect of mass tolling.  The purpose of such an endeavor would be to streamline this litigation without burdening the judiciary (yet) with thousands of different suits, consistent with the views expressed by the JPML about the viability of informal coordination.  While this letter is not intended to set forth all of the particulars of such an arrangement, we propose the following broad strokes to start the discussion:
>
> 1.   For all of our clients not currently in suit, a tolling agreement through December 31, 2015;
>
> 2.   In exchange for mass tolling, we provide certain basic information about each claimant and necessary HIPAA releases for the pre-suit collection of medical and pharmacy records . . .
>
> We believe tolling along these lines, along with reasonable pre-suit access to medical records, allows both parties to engage in the sort of informal coordination

---

[14] The JPML did not mention or discuss the fact that thousands of cases were in the pipeline, even though the issue was presented to the panel in briefing and at oral argument.  Lilly's counsel did concede that, eventually, if hundreds of Cymbalta cases continued  to be filed, a "tipping point" would be reached requiring consolidation, but Lilly believed that, if a Cymbalta MDL were not approved, that tipping point would not occur.  (*See* Transcript of Proceedings at 9-10, *In re Cymbalta (Duloxetine) Products Liab. Litig.*, MDL No. 2576, (Dec. 4, 2014), Wisner Decl., Exh. I.)

needed to resolve this massive litigation outside of a formal MDL.

(Letter from Michael Baum *et al*, 1-2 (Jan. 7, 2015), Wisner Decl., Exh. E.)  The proposal sought

to coordinate, informally, thousands of Cymbalta withdrawal cases without burdening the

judiciary—a proposal consistent with the JPML's instruction.  By giving Lilly access to medical

records, Lilly would be able to evaluate the merits of each case, avoiding the filing of thousands

of cases all over the country.  Unsurprisingly, and consistent with Lilly's effort to keep this

litigation fragmented, unwieldy and expensive, Lilly rejected the tolling proposal without

explanation.  (*See* Letter from Phyllis Jones, 1 (Jan. 13, 2015), Wisner Decl., Exh. F.)

In light of the JPML's (and Lilly's) refusal to create an MDL and Lilly's refusal to

informally coordinate the litigation for the thousands of cases in the pipeline, plaintiff's counsel

made a third proposal to centralize these nearly-identical cases:

> [H]aving different cases proceeding on different schedules in a multitude of
> different courts around the country is not efficient and creates case scheduling
> conflicts—a fact already evident in trying to coordinate a fraction of the cases that
> eventually will be filed.  We stress, again, there are thousands of cases in the
> pipeline.  Absent some simplification in the litigation process, this litigation will
> spiral out of control. …
>
> We now plan to file cases within the Southern District of Indiana, the district
> where Lilly is headquartered. This will allow coordination of cases in a single
> district in consideration of the volume of cases on the horizon.
>
> To further coordinate, we propose transferring existing cases that have not yet
> been litigated in any meaningful way (i.e., not *Herrera*, *Hexum*, or *Seagroves*) to
> the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a). . . .[15]

(Letter from Michael Baum *et al*, 1-2 (Jan. 22, 2015), Wisner Decl., Exh. G.)   Since Lilly is

headquartered in the Southern District of Indiana, it is a suitable venue for *every* Cymbalta

withdrawal case—not only is Lilly based there, a significant portion of the events giving rise to

---

[15] Plaintiffs also proposed, in the alternative, voluntarily dismissing this case and re-filing in the Southern District of
Indiana, provided Lilly would toll any applicable statute of limitations. Such an approach would have obviated the
need for this motion.  (Letter from Michael Baum *et al*, 1-2 (Jan. 22, 2015), Wisner Decl., Exh. G.)

these claims, e.g., the creation of a misleading label, occurred within the district.  *See* 21 U.S.C. § 1390 (b)(1) and (b)(2).  Thus, all cases against Lilly could be set within the Southern District, creating a single "centralized" venue for all Cymbalta withdrawal litigation.

Consistent with its strategy of *divide et impera*, Lilly rejected this third proposal.  (*See* Letter from Phyllis Jones, 1 (Jan. 27, 2015), Wisner Decl., Exh. H.)  According to Lilly, "[h]aving elected to file and serve the pending cases in their current venues, [Plaintiffs] have offered no justification for the transfer of those cases at this juncture."  (*Id.*)  And, even though placing cases in a defendant's home district is *specifically* contemplated by statute, *see* 28 U.S.C. § 1391(b)(1), Lilly stated that centralizing the litigation in the Southern District of Indiana would impair Lilly's ability to compel live trial testimony from plaintiffs' treating healthcare professionals at trial.  (*Id.*)  This need for live witness testimony from the treating physician was never raised in any prior discussions about centralization and, as discussed below, is easily remedied by videotaped depositions or live remote video testimony.

### III.   Status of this Case

This case was filed on November 26, 2014.  Service, however, was withheld under Fed. R. Civ. P. 4(m), as the Plaintiff was waiting to hear whether an MDL would be created for all Cymbalta withdrawal litigation.  Lilly answered the Complaint on January 5, 2015.  Since then, the parties exchanged initial disclosures and have engaged in a preliminary discovery.  No significant discovery has been exchanged and no significant litigation has occurred.  In this district, is one related action, *Hagan-Brown v. Eli Lilly & Co.*, 14-cv-01614 (E.D. Va.), which is also in the very early stages of litigation.

## <u>ARGUMENT</u>

A district court may, for "the convenience of parties and witnesses" and "in the interest of

justice," transfer a case to another venue provided the transferee court has valid jurisdiction and venue over the action. 28 U.S.C. § 1404(a). The purpose of the statute is "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense[.]" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960)). And, when "two cases involving precisely the same issues are simultaneously pending in different District Courts[,]" allowing the cases to proceed separately "leads to the wastefulness of time, energy and money that [Section] 1404(a) was designed to prevent." *Cont'l Grain*, 364 U.S. at 26.

Here, there is no dispute that the proposed transferee court, the Southern District of Indiana, has jurisdiction and venue over this lawsuit. There is complete diversity of litigants, *see* 28 U.S.C. § 1332(a)(1), and Lilly is headquartered in the Southern District of Indiana, *see* 21 U.S.C. § 1390(b)(1). Thus, the appropriateness of transfer turns on issues of convenience and "the interest of justice[.]" 28 U.S.C. § 1404(a). "The Court "must evaluate both the convenience of the parties and various public-interest considerations" and "decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 581 (2013). "In making such a determination, the Court must consider: (1) a plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Boeser, Inc.*, No. 1:14CV1458 JCC/TC, 2015 WL 402992, at *3 (E.D. Va. Jan. 28, 2015) (citing *Bd. of Trustees v. Sullivant Ave. Properties, LLC*, 508 F. Supp. 2d 473, 476 (E.D. Va. 2007)).

## I.   The Plaintiff's Choice of Venue Is the Southern District of Indiana

Although Plaintiff originally filed this action here, she would prefer to litigate this matter in

the Southern District of Indiana so that she can coordinate her lawsuit with other Cymbalta

withdrawal lawsuits and save considerable costs.  "The plaintiff's choice of forum 'is typically

entitled to substantial weight, especially where the chosen forum is the plaintiff's home *or bears*

*a substantial relation to the cause of action*.'"  *Bluestone Innovations, LLC v. LG Electronics,*

*Inc.*, 940 F. Supp. 2d 310, 314 (E.D. Va. 2013) (emphasis added) (quoting *Pragmatus AV, LLC*

*v. Facebook, Inc.*, 769 F. Supp. 2d 991, 995 (E.D. Va. 2011)); *Samsung Electronics Co. v.*

*Rambus, Inc.*, 386 F. Supp. 2d 708, 716 (E.D. Va. 2005).   Here, the Plaintiff's choice of forum is

where the nearly all of the unlawful conduct alleged in the complaint occurred, i.e., within

Lilly's global headquarters.  To be sure, the events related to Plaintiff's specific damages

occurred within this district, but nearly all of the liability witnesses reside in the Southern

District of Indiana.  And, courts typically place greater weight on the location of liability

witnesses as opposed to damages witnesses "because without liability, there is no need for

damages testimony."  *James v. Georgia Pac.*, No. 5:05CV931, 2005 WL 2978756, at *4 (N.D.

Ohio Nov. 2, 2005); *see Ramsey v. Fox News Network, LLC*, 323 F. Supp. 2d 1352, 1357 (N.D.

Ga. 2004); *Matthews v. Whitewater W. Indus., Ltd.*, No. 11-24424-CIV, 2012 WL 1605184, at *9

(S.D. Fla. May 8, 2012).  The Plaintiff's choice in venue, i.e., the Southern District of Indiana,

bears a substantial relationship to the causes of action alleged in the complaint.  That choice,

therefore, warrants weighs heavily in favor of transfer.

## II.    Transfer to the Southern District of Indiana, Where Lilly is Headquartered, Is More Convenient for *Both* Parties

Transfer to the Southern District of Indiana is more convenient for *both* parties.  For the

Plaintiff, transfer will significantly reduce the costs of litigation.  Since costs will be deducted

from any settlement or verdict, to the extent common costs can be shared with other Cymbalta

withdrawal litigants in the Southern District of Indiana, Plaintiff's potential recovery will

increase.  Common costs include appearances of counsel at court, resolution of common

discovery disputes (motions to compel, motions to quash, etc.), resolution of common expert

disputes (*Daubert* hearings, etc.),[16] and resolution of common pretrial disputes (motions *in*

*limine*, objections to exhibits or deposition designations, etc.).  Plaintiff may even be able to

share the costs of a multi-plaintiff trial with other Cymbalta withdrawal litigants if this case were

to proceed in the Southern District of Indiana.  Independently litigating this case in this Court,

however, would likely swallow up much, if not all, of the Plaintiff's recovery.

Similarly, transfer of this action to the Southern District of Indiana in Indianapolis would

be more convenient for Lilly.  Lilly's global headquarters and general counsel are 1.5 miles from

the courthouse.  Nearly all of Lilly's corporate witnesses and nearly all of the documents and

information relevant to common discovery are located in Indianapolis—a fact Lilly argued to the

JPML.  (*See* Wisner Decl., Exh. C at 15-17 (describing how Lilly's witnesses are in

Indianapolis).)  Were this case to proceed to trial here, the corporate witnesses Lilly would like

to call would be forced to travel to this (and every other) Court to testify.  Centralizing these

cases in Lilly's hometown, however, would allow Lilly's corporate witnesses to testify in any

case that proceeds to trial, without cross-country travel or needless expense.  And, if there are

multi-plaintiff trials in the Southern District of Indiana, those same witnesses would only need to

testify once, saving Lilly's "willing" witnesses from having to travel repeatedly around the

country for each case.  In the context of a mass tort like this, it is difficult to imagine a more

convenient location for Lilly to litigate this case considering the proposed forum is in Lilly's

"backyard."  *See, e.g.*, *Pragmatus*, 769 F. Supp. 2d at 995-96 (finding transfer to California was

---

[16] For example, if this matter proceeds independently here, a separate *Daubert* hearing will be required for the parties' experts, even though most of the experts will be testifying about issues common to all Cymbalta withdrawal cases.  If this matter were in the Southern District of Indiana, costs of these hearings could be shared with all other Cymbalta withdrawal litigants, significantly increasing the Plaintiff's potential recovery.

more convenient because the defendants were headquartered there).  Indeed, this is why the

venue statute specifies a defendant's jurisdiction as a proper venue.  28 U.S.C. § 1391(b)(1).

Moreover, Lilly's costs in litigating these cases would be significantly reduced if this

matter were transferred.  Instead of having to pay for the appearance of counsel in countless

courts around the country, including this one, Lilly can centralize its defense in its hometown,

reducing the need for multiple and duplicative court appearances and allowing for resolution of

important global issues.  As Lilly stated to the JPML:

> Without diminishing the Plaintiffs' claimed injuries, they are for the most part
> alleged to be transient in nature and without physical impairment or disability.
> The corresponding value of such cases could quickly be outstripped merely by the
> costs of repeated cross-country travel.  **<u>Such a result would be neither just nor
> efficient.</u>**

(Wisner Decl., Exh. C at 16 (emphasis added).)  Putting this case in the Southern District of

Indiana gives Lilly the "just" and "efficient" result it asked for, and ensures that the costs of

defending these cases does not out pace their "corresponding value."  (*Id.*)

Transfer to the Southern District of Indiana will also eliminate an inherent incentive to "try

and try" again on specific legal issues.  As it stands, if one party loses a legal dispute in one

court, there is a strong incentive to attempt to re-litigate that legal dispute in another case, hoping

a different judge sees the law differently.  Instead of having one judge rule and dispose of an

issue for all the cases, each party will simply re-litigate and re-litigate and re-litigate.  This

process, which is inherent in parallel proceedings, is costly and time consuming, not just for the

parties but for each court being forced to evaluate these same issues anew.

There is no question that centralization in the Southern District of Indiana would reduce

costs, eliminate duplication of effort, and streamline this case and all related actions.  To be sure,

it is a rarity that a *plaintiff* seeks transfer to the defendant's home jurisdiction.  And, if this matter

were a stand-alone action, there would be no convenience in transferring this case to the

Southern District of Indiana.  This case, however, does not stand alone.  It is one of dozens

already on file, and one of thousands in the pipeline.  In this mass tort context, centralization

with other nearly-identical cases is clearly more convenient for the litigants and effectuates the

purpose of Section 1404(a), i.e., "to prevent the waste 'of time, energy and money' and 'to

protect litigants . . . against unnecessary inconvenience and expense[.]"  *Van Dusen*, 376 U.S. at

616.  This factor, i.e., party convenience, weighs in favor of transfer.

III. **Transfer to the Southern District of Indiana Will Significantly Promote Judicial Economy and the Interests of Justice**

"Depending on the circumstances of the case, 'the interest of justice may be decisive in

ruling on a transfer motion even though the convenience of the parties and witnesses point in a

different direction.'"  *Samsung*, 386 F. Supp. 2d at 716 (quoting 15 Wright, Miller & Cooper,

*Federal Practice and Procedure: Jurisdiction* 2d § 3854 at 439–440); *accord Regents of the*

*Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1565 (Fed. Cir. 1997) (citing *Coffey v. Van*

*Dorn Iron Works,* 796 F.2d 217, 220–21 (7th Cir. 1986).  "The most prominent elements of

systemic integrity are judicial economy and the avoidance of inconsistent judgments."  *Heinz*

*Kettler GMBH & Co. v. Razor USA, LLC,* 750 F. Supp. 2d 660, 669 (E.D. Va. 2010) (citing

*Byerson v. Equifax Info. Servs., LLC,* 467 F.Supp.2d 627, 635 (E.D. Va. 2006)).

Here, the interests of judicial economy strongly weigh in favor of transfer.  As described

above, future Cymbalta claims will be filed in the Southern District of Indiana.  *See, e.g.*, *Hill et*

*al v. Eli Lilly and Company*, 15-CV-141-LJM-DKL (S.D. In.).  Transfer would allow one court,

as opposed to twenty-nine (including this one), to (1) determine the permissible scope of

discovery; (2) enter important pretrial orders such as protective and scheduling orders; (3)

conduct a *Daubert* analysis of the parties' experts; (4) determine whether punitive damages are

appropriate; (5) uniformly address Lilly's affirmative defenses, i.e., preemption, learned

intermediary, statute of limitations, etc.; (6) rule on the admissibility of common evidence, i.e.,

motions *in limine* and objections to exhibits and witness depositions; and (7) determine the

proper issues for trial.  "Running a parallel case here would be unnecessarily duplicative—a

waste of judicial resources."  *Bluestone*, 940 F. Supp. 2d at 319.  Indeed, transfer to the Southern

District of Indiana could even allow *one* court to oversee multi-plaintiff trials, significantly

reducing judicial duplication.

Transfer of this action to the Southern District of Indiana would also help avoid

inconsistent rulings.  *Heinz*, 750 F. Supp. 2d at 669 (citing *Byerson,* 467 F.Supp.2d at 635);

*Bluestone*, 940 F. Supp. 2d at 320 ("[P]erhaps the singularly most important factor in this

analysis [is that] trying these cases separately creates the serious risk of inconsistent results.").

Several important threshold issues will need to be evaluated by any court overseeing this case.

Some of these include the proper scope of discovery, the legal sufficiency of the Cymbalta label,

*see, e.g.*, *McDowell v. Eli Lilly & Co.*, No. 13 CIV. 3786, 2014 WL 5801604, at *10-15

(S.D.N.Y. Nov. 7, 2014) (granting summary judgment, without allowing expert testimony,

holding that the Cymbalta label was sufficient as a matter of law) (under reconsideration), and

whether Plaintiff's design defect claims are preempted by federal law.  Similarly, each case seeks

injunctive relief.  Allowing these issues to be resolved by dozens of different courts could lead to

inconsistent rulings and conflicting injunctions.

Admittedly, this case involves the application of Virginia law, and transfer of this matter to

the Southern District of Indiana would require that an out-of-state court apply that law.  There is

an "interest in having the trial of a diversity case in a forum that is at home with the law that

must govern the action."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981).  However,

the causes of action at issue in this lawsuit are not unique to Virginia.  Failure to warn and design defect claims are nearly identical state to state.  A federal court sitting in diversity in Indiana is fully capable of interpreting Virginia law, particularly since there are no novel or unsettled issues of Virginia law raised by this case.  And, in light of the judicial resources saved by transfer, the interest of having trials in a home forum is not sufficient to prevent transfer.  Moreover, since Lilly is based in Indiana, use of a local jury to adjudicate Lilly's conduct is particularly "just." Much of the wrongful conduct giving rise to punitive damages transpired in Indiana, and local Indiana jurors have an interest in making sure its hometown corporation is held accountable.  *See Virginia Innovation Sciences, Inc. v. Samsung Electronics Co.*, 928 F. Supp. 2d 863, 873 (E.D. Va. 2013) ("[J]urors in New Jersey may have an interest in a case involving a local company[.]").  This is not a situation where transfer would unfairly burden "forum citizens with jury duty[.]" *Jaffe v. LSI Corp.*, 874 F. Supp. 2d 499, 505 (E.D. Va. 2012) (quoting *Byerson,* 467 F.Supp.2d at 635).

In the context of this "interests of justice" analysis, Lilly's opposition to centralization is made at the expense of the court system.  There is no *legitimate* reason to force dozens of different courts around the country to engage in this complex pharmaceutical case when many of the same issues could be resolved by a single court.  It creates needless duplication of work for an already overburdened judiciary.  The interests of justice and judicial economy weigh heavily in favor of transfer.

## IV.   Transfer to the Southern District of Indiana Would Not, on the Whole, Inconvenience Potential Witnesses

Another factor the Court should consider in a Section 1404(a) analysis is the "availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses[.] *Atl. Marine*, 134 S. Ct. at 581 n.6.  In other words, the Court should

consider how transfer would affect the cost of willing witnesses to participate and whether the ability to compel an unwilling witness to testify would be affected by transfer.

With regard to *willing* witnesses, transfer to the Southern District of Indiana is neutral with regard to cost of attendance.  For every witness in this district who can provide testimony about the specific injuries of the Plaintiff, there are multiple witnesses based in Indiana who can testify about drafting the Cymbalta label, designing the Cymbalta pill, and/or developing Cymbalta marketing, i.e., current and former employees of Lilly.  Based on proximity alone, transfer to the Southern District of Indiana is more convenient for certain witnesses and less convenient for others.  On the whole, this factor is neutral.

With regard to the ability to compel unwilling witnesses to testify at trial, the analysis is slightly more complicated, but ultimately yields the same result.  Lilly's only reason for opposing transfer is that transfer "would materially impair the ability of the parties to secure live trial testimony from some of the core witnesses at issue, including any healthcare professionals who had a role in plaintiffs' care."  (Letter from Phyllis Jones, 1 (Jan. 27, 2015), Wisner Decl., Exh. H.)  This reason for opposing transfer—a reason Plaintiff submits is a smokescreen— centers on a district court's subpoena power under Fed. R. Civ. P. 45(c).  As a general matter, a district court cannot subpoena an individual to testify at trial if that individual resides over 100 miles from the district.  Fed. R. Civ. P. 45(c)(1).  Thus, if this case is transferred, local witnesses will not be subject to the Southern District of Indiana's power to compel in-person testimony at trial.  But this issue cuts both ways.  If this case is *not* transferred, then Plaintiff will not be able to compel live testimony from Lilly's employees in Indiana.  For example, Sarah A. Mescher, a regulatory labeling consultant, and Sharon L. Hoog, a medical adviser, are two key witnesses identified by Lilly and they both reside in the Southern District of Indiana.  Plaintiff will not be

able to compel their appearance at trial should this matter proceed here.

More importantly, this concern over being able to compel appearance at trial should not carry significant weight.  Modern technology addresses many of the problems raised by not having live trial testimony.

> Although live testimony is the preferred mode of presenting evidence, when non-party witnesses are unavailable to give live testimony, videotaped depositions often are sufficient.  Somewhat less weight is given to witness inconvenience when a party is unable to demonstrate with any particularity that videotaped deposition testimony will be inadequate, and that live testimony is critical.

*Samsung*, 386 F. Supp. 2d at 719 (citations omitted).   Should this Court transfer this case to the Southern District of Indiana, Lilly will have an opportunity to take a video deposition of the Plaintiff's treating physician and obtain whatever testimony it would like to present to the jury. And, while live testimony is preferred, the use of video depositions in pharmaceutical litigation is commonplace and routine.  If, for some reason, Lilly would need live testimony that was otherwise unobtainable through video deposition, Lilly could request a live contemporaneous transmission under Fed. R. Civ. P. 43(a).  This approach has been used in centralized pharmaceutical proceedings with success.  *See, e.g.*, *In re Vioxx Products Liab. Litig.*, 439 F. Supp. 2d 640, 642 (E.D. La. 2006) ([T]here has been an increasing trend by federal courts allowing . . . the use of contemporaneous transmission of trial testimony.")  Thus, Lilly's concern about being able to compel live trial testimony should not carry much, if any, weight in this transfer analysis.

## **CONCLUSION**

It is difficult to imagine why a defendant would oppose transferring a lawsuit to its home district.  Nothing could be more convenient.  This is particularly true when transfer leads to centralization of dozens (and likely thousands) of related cases in a single court.  Lilly's

resistance to transfer, however, is not predicated on making this litigation easier or less expensive.  It is predicated on making this litigation as expensive and difficult as possible. Thankfully, 28 U.S.C. § 1404(a) does not abide.  The purpose of Section 1404(a) is "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense[.]" *Van Dusen*, 376 U.S. at 616.  Transfer, here, effectuates that purpose. Centralization of this case with other cases in the Southern District of Indiana saves the court system juridical resources and the litigants' time, energy, and money.

Plaintiff respectfully requests that this Court transfer this case to the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a), so that it can be litigated with other Cymbalta withdrawal cases in a single, convenient venue.

DATED:  February 20, 2015             Respectfully submitted,

**MILLER LEGAL, LLC**

/s/ Brielle M. Hunt
Brielle M. Hunt, Esq.
175 South Pantops Drive, Ste. 301
Charlottesville, Virginia 22911
Tel: (434) 529-6909
Fax: (888) 830-1488
Email: bhunt@millerlegalllc.com

**BAUM HEDLUND ARISTEI & GOLDMAN, P.C.**
R. Brent Wisner, Esq. (*pro hac vice*)
rbwisner@baumhedlundlaw.com
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel:  (310) 207-3233
Fax:  (310) 820-7444

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 20th day of February, 2015, a true copy of the

foregoing MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO TRANSFER

VENUE was filed electronically with the Clerk of Court using the CM/ECF system, which will

send a notification of such filing to the following:


Jeffrey Todd Bozman
Michael X. Imbroscio *(pro hac vice)*
Phyllis A. Jones *(pro hac vice)*
Brett C. Reynolds *(pro hac vice)*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tele (202) 662-5335
Fax (202) 778-5535
jbozman@cov.com

/s/ Brielle M. Hunt
Brielle M. Hunt
MILLER LEGAL LLC
Va. Bar 87652
175 S. Pantops Drive, Ste. 301
Charlottesville, VA 22911
Tele (434) 529-6909
Fax (888) 830-1488
bhunt@millerlegalllc.com