**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| GILDA HAGAN-BROWN, | Case No. 1:14-cv-01614-AJT-JFA |
| Plaintiff, | Hon. John F. Anderson |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL** |
| ELI LILLY AND COMPANY, an Indiana corporation, | |
| Defendant. | |
| JANINE ALI, | Case No. 1:14-cv-01615-AJT-JFA |
| Plaintiff, | Hon. John F. Anderson |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL** |
| ELI LILLY AND COMPANY, an Indiana corporation, | |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS....................................................................................................... 1

TABLE OF AUTHORITIES ......................................................**Error! Bookmark not defined.**

INTRODUCTION ............................................................................................................... 2

BACKGROUND ................................................................................................................. 2

    I.    The Cymbalta Litigation:  What These Cases Are About ........................................ 2

    II.   Plaintiff's Motion to Transfer ............................................................................... 7

    III.  Discovery Status ................................................................................................. 8

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ................................................................................................................... 10

    I.    RFP No. 1:  Production of All Cymbalta eCTDs ................................................. 10

    II.   RFPs 24, 25, 26, 27, 28, 29, 35, 36, 39, and 41:  Production of Lilly's Internal Communications ................................................................................................ 13

    III.  RFP No. 96:  Production of Plaintiff's Medical Records in Lilly's Possession .............. 15

CONCLUSION ................................................................................................................. 17

## **INTRODUCTION**

Plaintiffs Gilda Hagan-Brown and Janine Ali move to compel production of documents from Defendant Eli Lilly and Company ("Lilly") on three issues.  First, Plaintiffs seek production of regulatory materials for Cymbalta as they were produced to the U.S. Food and Drug Administration in their native format.  Second, Plaintiffs seek production of internal communications, i.e., emails, within Lilly related to twenty-nine specifically-identified individuals about Cymbalta withdrawal—the subject of this litigation.   This list of twenty-nine was culled from an initial list of over 275 people identified from previous document productions.  Third, Plaintiffs move to compel production of any non-privileged documents that Lilly may have that concern Plaintiffs, including any medical records Lilly obtained by use of the medical authorizations they both provided to Lilly last month.

## **BACKGROUND**

## I.    **The Cymbalta Litigation:  What These Cases Are About**

Cymbalta is an antidepressant in a class known as selective serotonin and norepinephrine reuptake inhibitors ("SNRIs").  This lawsuit centers on a phenomenon called "withdrawal"—the physical and mental effects patients suffer when they stop Cymbalta.  The term "withdrawal" is deliberate.  The physical effects patients experience upon stopping Cymbalta mirror those that drug addicts experience when they stop a narcotic:  dizziness, headaches, nausea, diarrhea, excessive sweating, sensory disturbances, nightmares, and insomnia.  However, in addition to these "typical" withdrawal effects, patients stopping Cymbalta also experience side effects that are unique to antidepressants: electronic shock sensations in the brain, loss of motor functions, seizures, extreme mood swings, depression (even if the patient never previously suffered from depression), emotional outbursts, and suicidal behavior / attempts.  And, since prolonged use of

2

Cymbalta can cause lasting changes to a brain's architecture and undermine its ability to reuptake neurotransmitters (a phenomenon known as "down regulation"), withdrawing from Cymbalta can last months or even years. For others, the withdrawal effects are so severe that patients are forced to continue on Cymbalta indefinitely.

It is widely accepted that an antidepressant's withdrawal risk is associated with the drug's half-life, i.e., the amount of time for half of a drug to leave a patient's system. The shorter a drug's half-life, the faster the drug leaves the patient's body. This rapid depletion, in turn, leads to more pronounced withdrawal symptoms.

Much of the research about the relationship between half-life and withdrawal was conducted by Lilly as part of Lilly's efforts to bolster sales of the antidepressant Prozac in the 1980s and 1990s. Lilly wanted to position Prozac as being superior to its competitors Zoloft and Paxil by marketing Prozac's longer half-life as having a superior withdrawal profile. Prozac has a half-life of approximately 6 days. Zoloft and Paxil's are 26 and 21 hours respectively. Lilly sponsored clinical trials to measure antidepressant withdrawal in Prozac, Paxil, and Zoloft, and published these studies in medical journals. The articles espoused Prozac's superior withdrawal profile over Zoloft and Paxil, crediting Prozac's long half-life as the reason.

Thus, when it came to Cymbalta, Lilly had a problem. Lilly knew the drug posed a serious withdrawal risk. Not only is Cymbalta's half-life only twelve hours—half the length of Paxil or Zoloft—Lilly's own clinical data revealed that a large percentage of Cymbalta users who stopped the medication suffered serious withdrawal symptoms. Specifically, Lilly's data showed that approximately **45% of patients** who stopped taking Cymbalta following completion of placebo-controlled trials spontaneously[1] reported withdrawal symptoms. Of these, 50.6% were

---

[1] Use of the word "spontaneously" is deliberate. Lilly researchers did not use a systematic

moderate, 9.6% were severe, and 53.7% remained unresolved after two-weeks.  For patients who stopped Cymbalta after an open-label trial—the situation that most closely approximates a typical patient's experience of taking a drug—**over 50% of patients** spontaneously reported withdrawal symptoms.  Of these, 46.3% were moderate, 17.2% were severe, and 55.2% had not resolved after two weeks.  That means, on average, 8.73% (17.2% of 50.8%) of patients that knowingly stop Cymbalta experience *severe* withdrawal reactions.

However, despite having clear knowledge of Cymbalta's serious withdrawal risks, Lilly did not adequately warn about this risk in its labeling.  When Cymbalta came on the market in 2004, the label for Cymbalta under "Discontinuation of Treatment with Cymbalta" stated:

> Discontinuation symptoms have been systematically evaluated in patients taking Cymbalta.  Following abrupt discontinuation in placebo controlled clinical trials of up to 9-weeks duration, the following symptoms occurred **at a rate greater than or equal to 2%** and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness; nausea; headache; paresthesia; vomiting; irritability; and nightmare.

> During marketing **of other SSRIs and SNRIs** (Serotonin and Norepinephrine Reuptake Inhibitors), there have been spontaneous reports of adverse events occurring upon discontinuation of these drugs, particularly when abrupt, including the following: dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g. paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional liability, insomnia, hypomania, tinnitus, and seizures.  Although these events are generally self-limiting, some have been reported to be severe.

> Patients should be monitored for these symptoms when discontinuing treatment with Cymbalta.  A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible.  If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered.  Subsequently, the physician may continue decreasing the dose but at a more gradual rate.[2]

---

checklist for measuring withdrawal symptoms during the trials, but instead relied on volunteered reports from participants.  Lilly researchers acknowledge that use of a symptom check list would have resulted in an increased incidence rate.

[2] In later years, the language under this section changed, and the phrase "greater than or equal to 2%" was changed to "greater than or equal to 1%" and then, most recently, to "greater than 1%."

This warning is materially deficient and misleading.  It fails to provide *meaningful* warning about the **frequency**, **severity**, and **duration** of Cymbalta withdrawal—information Lilly possessed from its Cymbalta trials but never disclosed:

- **Frequency:**  The warning suggests that the withdrawal risk is rare, occurring "at a rate greater than or equal" to 1 or 2%, even though the actual rate of patients experiencing withdrawal is *at least* 45%.  Indeed, the data from Lilly's Cymbalta trials reveals, with statistically significant results, that in comparison to stopping a placebo, stopping Cymbalta elevated the risk of specific symptoms by as much as twenty-three times.

- **Severity:** The warning label does not provide accurate information about the severity of Cymbalta withdrawal, omitting the fact that, in Lilly's Cymbalta trials, between 9.6% and 17.2% suffered *severe* withdrawal and approximately 50% suffered moderate withdrawal.  Instead, the label misleadingly states, with regard to SSRIs and SNRIs in general, that withdrawal events "are generally self-limiting," and "some have been reported to be severe."  This waxes over Cymbalta-specific risks and incorrectly suggests that Cymbalta is comparable to other drugs in its class—a fact that is demonstrably false.  The label also does not mention the likelihood of a patient suffering from moderate withdrawal.

- **Duration:** The warning label does not discuss the anticipated duration of Cymbalta withdrawal.  In Lilly's Cymbalta trials, over 50% of those who suffered from withdrawal lasted longer than two weeks.  Nonetheless, Lilly makes no mention of any anticipated duration, stating, instead that withdrawal events were "generally self-limiting."  This falsely gives the impression that the duration of withdrawal is limited and/or relatively short.

This label is in stark contrast to the Cymbalta label in Europe, and in almost all other countries.  The European label states that "withdrawal symptoms when treatment is discontinued are common[.]"  The U.S. Label does not state that withdrawal is common—indeed, it does even use the term withdrawal, but the euphemism "Discontinuation symptoms."

The European label states that "[i]n clinical trials adverse events seen on abrupt treatment discontinuation occurred in approximately 45% of patients treated with Cymbalta[.]"  There is no "greater than or equal to" language.  Nowhere on the U.S. Label does it indicate what the

---

Also, various withdrawal side effects were added and/or removed from the label over time.  In all other material respects, however, the Cymbalta label did not change.

likelihood of suffering withdrawal is.

The European label states that "[t]he risk of withdrawal symptoms seen with SSRI's and SNRI's may be dependent on several factors including the duration and dose of therapy and the rate of dose reduction." The U.S. Label does not provide any information about dose, duration, or its correlation with withdrawal.

The European label states that withdrawal symptoms "usually occur within the first few days of discontinuing treatment, but there have been very rare reports of such symptoms in patients who have inadvertently missed a dose." The U.S. Label does *not* state how soon the onset of withdrawal is nor does it mention any risks associated with missing doses.

The European label states that "[t]he risk of withdrawal symptoms seen with SSRI's and SNRI's may be dependent on several factors including the duration and dose of therapy and the rate of dose reduction." The U.S. Label does not provide any information about dose, duration, or its correlation with withdrawal.

The European label states that "[g]enerally these [withdrawal] symptoms are self-limiting and usually resolve within 2 weeks, though in some individuals they may be prolonged (2-3 months or more)." The U.S. Label does not state how long withdrawal could or is likely to last. There is no information about potential duration.

The European label states that "duloxetine should be gradually tapered when discontinuing treatment over a period of no less than 2 weeks[.]" The U.S. Label does not state how long a drug should be tapered or give any instructions on the time it should take to safely discontinue Cymbalta.

This lawsuit also alleges that the Cymbalta drug, itself, is defectively designed. Cymbalta comes in 20mg, 30 mg, or 60 mg capsules. Due to the short half-life of Cymbalta, the drug must

be dispensed in an enteric-coated (delayed release) capsule.  And, to ensure that the enteric

coating of the Cymbalta capsule is not compromised, the Cymbalta label instructs patients that

the Cymbalta capsule is to "be swallowed whole and should not be chewed or crushed, nor

should the contents be sprinkled on food or mixed with liquids."  Thus, unlike other medications

which are manufactured as scored tablets or dissolvable capsules that can be turned into smaller

doses, the smallest possible dose for Cymbalta is 20 mg, swallowed whole.  In the context of

withdrawal, this poses a problem.  The Cymbalta label recommends tapering off the medication

gradually, but practically, the patient will eventually have to quit taking Cymbalta at a 20 mg

dose, without any gradual tapering, i.e., the 20 mg cliff.   Patients prescribed the 20 mg dose are

not able to taper whatsoever.  Thus, the actual design of the Cymbalta pill prevents the gradual

tapering needed to safely discontinue Cymbalta.  Had Lilly developed smaller doses, i.e.,

tapering doses, or designed the Cymbalta capsule in a way that allowed a gradual reduction of

doses below 20 mg, certain patients may not have suffered from the debilitating effects of

withdrawal.

## II.    Plaintiff's Motion to Transfer

On February 20, 2015, Plaintiffs filed motions to transfer this action to the Southern

District of Indiana pursuant to 28 U.S.C. § 1404(a), to allow this case to be centralized with other

Cymbalta withdrawal cases in a single forum.  (*Hagan-Brown*, Dkt. 21 & 22; *Ali*, Dkt. 23 & 24.)

Lilly vigorously opposed, demanding to remain in this jurisdiction because, in part, it would

allow the case be resolved expediently with this Court's accelerated and efficient docket.

(*Hagan-Brown*, Dkt. 24l; *Ali*, Dkt. 26.)  The motion was fully briefed and argued before Judge

Trenga on February 27, 2015 and on March 3, 2015, Judge Trenga issued a ten-page order.

(*Hagan-Brown*, Dkt. 27; *Ali.*, Dkt. 32.)   Judge Trenga discussed the history of this litigation and

the various considerations that govern transfer under 28 U.S.C. § 1404(a).  (*Id.* at 1-8.)

Ultimately, Judge Trenga outlined seven considerations that led to his decision to defer ruling on

the motion to transfer until after discovery was complete.  (*Id.* at 8-9.)  One of those

considerations, which is relevant here was:

> On-going discovery in this District will provide an opportunity on a relatively
> expedited basis to ***complete discovery on common issues*** that will be useable in
> ***all Cymbalta withdrawal cases*** and for that reason will contribute to the efficient
> case management of those cases.

(*Id.* at 9 (emphasis added).)

## III.   Discovery Status

Notwithstanding the Plaintiffs' desire to transfer this matter to the Southern District of

Indiana, on February 4, 2015, Plaintiffs served her First Set of Requests for Production ("RFPs")

(105 requests) (Exh. 1-A),[3] First Set of Requests for Admission ("RFAs") (61 requests) (Exh. 2-

A), and First Set of Interrogatories (22 Interrogatories) (Exh. 3-A).  These requests were

designed to supplement the documents that had been produced in two cases, *Hexum et al v. Eli

Lilly and Co.*, 2:13-cv-02701-SVW-MAN (C.D. Cal.); *Herrera et al v. Eli Lilly and Co.*, 2:13-

cv-02702-SVW-MAN (C. D. Cal.), which are set for trial this May.

In *Herrera* and *Hexum*, Lilly produced approximately 109,000 documents.  Having

reviewed these documents, it is clear that there are serious deficiencies in their production.  First,

many of the documents are redacted without any explanation.  There are thousands of pages of

black boxes purporting to be responsive documents, which contain no information.  And, there

are many more partially redacted documents that have information obliterated—information that

---

[3] All Exhibits referenced in this motion are attached to the Declaration of R. Brent Wisner in
support of Plaintiff's Motion to Compel, filed concurrently with this motion.

would appear to be very relevant to this litigation—without any explanation.[4]  There are also

apparently about 150 documents that were never produced for privilege reasons.  They simply

have "Document Withheld for Privilege" stamped across the front.  And yet, the privilege log

consists of one entry.  Second, the documents are incomplete and nearly impossible to review

coherently.  For example, many of the regulatory documents at issue were submitted to the FDA

in an easy-to-use electronic format called an Electronic Common Technical Document ("eCTD")

format.  Instead of the producing the eCTD in their native format, however, Lilly produced

scanned images of documents which appear to be sections of the eCTDs.  Considering these

regulatory files consist of the vast majority of Lilly's prior production, this format makes them

almost impossible to use.  Third, with regard to Lilly's internal communications about Cymbalta

withdrawal, Lilly limited its production of emails to just nine individuals that Lilly pre-selected.

Thus, significant internal communications that are relevant to this litigation remain unproduced.

On February 23, 2015, Lilly served its objections to Plaintiffs' written discovery requests,

(Exh. 1-B, 2-B, 3-B, 4-B, 5-B, 6-B), and on March 9, 2015, Lilly served its responses, (Exh. 1-C,

2-C, 3-C, 4-C, 5-C, 6-C).  Lilly did not provide *any* documents in response to Plaintiffs' RFPs.

Instead, Lilly either cited to documents that had been produced in earlier Cymbalta withdrawal

litigation or refused to provide additional documents.[5]

On March 13, 2015, Plaintiff's counsel sent a letter to Lilly outlining the various

deficiencies in Lilly's responses.  (Exh. 7.)  This prompted a 2 ½ hour meet and confer on March

17, 2015.  During this meeting, the parties discussed all the deficiencies Plaintiff identified and

---

[4] Plaintiff's counsel will bring several examples of these documents to the hearing should the
Court want to see a sampling.  The documents are covered under a Protective Order in the
*Herrera* and *Hexum* cases that prohibits their filing in the public record absent a Court order.
[5] Lilly has promised to produce documents responsive to RFPs 22, 48, 80 and 83, but that
production is still forthcoming.

tried to resolve as many outstanding discovery issues as possible.  Numerous compromises were

struck, but several issues resulted in an impasse.  Three of those issues, all related to the

production of documents, are the subject of this motion.[6]

## LEGAL STANDARD

Discovery "is broad in scope and freely permitted."  *Carefirst of Md., Inc. v. Carefirst*

*Pregnancy Centers, Inc.,* 334 F.3d 390, 402 (4th Cir. 2003).  "In essence, a party is entitled to

any nonprivileged information that is relevant to a claim or defense in the matter."  *Humanscale*

*Corp. v. CompX Int'l, Inc.*, No. 3:09-CV-86, 2009 WL 5091648, at *1 (E.D. Va. Dec. 24, 2009)

(citing Fed. R. Civ. P. 26(b)).  Relevant information need not be admissible at trial, it simply

must appear "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R.

Civ. P.  26(b)(1).  "[T]he burden of proof is with the party objecting to the discovery to establish

that the challenged production should not be permitted."  *Singletary v. Sterling Transp. Co.*, 289

F.R.D. 237, 241 (E.D. Va. 2012).

## ARGUMENT

I.    **RFP No. 1:  Production of All Cymbalta eCTDs**

Plaintiff's RFP No. 1 states:

> Please produce the Electronic Common Technical Document (eCTD) or
> equivalent electronic submission for all CYMBALTA indications, whether that
> indication was approved or denied, including but not limited to: Major Depressive
> Disorder (MDD), Generalized Anxiety Disorder (GAD), Neuropathic Pain from
> Diabetes, Chronic Pain, Chronic Musculoskeletal Pain, Fibromyalgia, MDD
> Maintenance, GAD Maintenance, and Stress Urinary Incontinence (SUI).

(Exh. 1-A at 8; 4-A at 8.)  eCTD is the "standard format for electronic regulatory submissions"

used by the FDA.  *See* U.S. Food and Drug Administration, eCTD Basics and Getting Started,

---

[6] Several additional issues also reached an impasse.  They will likely be the subject of a future
motion to compel.

http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ ElectronicSubmissions/ucm330116.htm (updated Dec. 11, 2014).  This request seeks production of all Cymbalta eCTDs that were submitted to the FDA in their native format.   In response, Lilly directs Plaintiff to various bates ranges spanning over one million pages of documents.  (Exh. 1-C at 2; Exh.4-C at 2.)  These documents are presented in a .tiff format, i.e., images of pages. Typically, eCTDs are presented in an .html browser, allowing the user to navigate the various components of a regulatory submission with relative ease.   By producing these eCTDs in a .tiff format, there are no hyperlinks connecting the table of contents to documents, and navigating is impossible.

Fed. R. Civ. P. 36(b)(2)(E) specifies how a responding party must produce electronically stored information.  Under the Rule, if the requesting party specifies how it would like the production of electronically stored information, then the responding party is under an obligation to produce documents in that format.  *See U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, No. 10-CV-01401-LS WVG, 2015 WL 818032, at *17 (S.D. Cal. Feb. 20, 2015); *Anderson Living Trust v. WPX Energy Prod., LLC*, 298 F.R.D. 514, 526 (D.N.M. 2014) ("It is only if the requesting party declines to specify a form that the producing party is offered a choice between producing in the form "in which it is ordinary maintained"—native format—or "in a reasonably useful form or forms.").  The responding party may object under Fed. R. Civ. P. 34(b)(2)(D), but "must state the form or forms it intends to use."

Here, Plaintiffs' instruction No. 11 states: "As provided by Federal Rule of Civil Procedure Rule 34(b)(2)(E)(iii), please produce all electronically stored information in their native electronic format with all metadata preserved in a *.DAT file format." (*E.g.*, Exh. 1-A at 6.)  In response, Lilly objected to this instruction "to the extent that its use of the term

'electronically stored information' imposes burdens on Lilly beyond its obligations under the

Federal Rules of Civil Procedure."  (Exh. 1-B at 2.)  Lilly did not specify, pursuant to Fed. R.

Civ. P. 34(b)(2)(D) how it would produce documents or, more importantly, why it would not

produce documents in their native format.

The parties discussed this issue on March 17, 2015, and Lilly categorically refused to

produce the eCTDs in their native format.  According to Lilly, the prior production in .tiff format

is the "industry standard" and that Plaintiffs' specific request for native format information

would not be accommodated.

Some courts have held, relying on guidance from the Sedona Conference that, "even if

native files are requested, it is sufficient to produce memoranda, emails, and electronic records in

PDF or TIFF format accompanied by a load file containing searchable text and selected

metadata."  *Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dep't of Homeland*

*Sec.*, 255 F.R.D. 350, 356 (S.D.N.Y. 2008) (citing *Sedona Principles 2d* Principle 12, Cmt. 12v

Illus. i.).  But this view is predicated on an assumption that this form of production "is in useable

form." *Aguilar*, 255 F.R.D. at 356.  As the *Aguilar* court explained, "[a]lthough a party may

produce its ESI in another 'reasonably usable form,' this does not mean 'that a responding party

is free to convert electronically stored information from the form in which it is ordinarily

maintained to a different form that makes it ***more difficult or burdensome for the requesting***

***party to use the information efficiently in the litigation***.'"  *Id.* at 355 (emphasis added) (quoting

Fed. R. Civ. P. 34(b), advisory committee's note, 2006 amendment).   "In particular, if the ESI is

kept in an electronically-searchable form, it 'should not be produced in a form that removes or

significantly degrades this feature.'" *Id.*  For a dynamic data interface such an eCTD, whereby

the native format of the document facilitates searching and reviewing, converting this into a .tiff

production not only "significantly degrades" the ability to review the information, is effectively eliminates it.

As it stands, Plaintiffs made a valid discovery request, seeking production of highly relevant information and Lilly has not complied with that request.  Plaintiff specifically demanded the production of a document type, i.e., eCTD, whose use in native format comports with the purposes of Fed. R. Civ. P. 34 and commonsense.  Lilly's refusal to produce these documents in the requested format is improper.  Plaintiffs request that the Court enter an order compelling Lilly to produce all eCTDs for Cymbalta.

## II.   RFPs 24, 25, 26, 27, 28, 29, 35, 36, 39, and 41:  Production of Lilly's Internal Communications

RFPs 24, 25, 26, 27, 28, 29, 35, 36, 39, and 41 seek production of internal Lilly communications about various topics and issues related to Cymbalta withdrawal. (Exh. 1-A at X.)  Lilly has not produced any responsive documents beyond what was previously produced in *Herrera* and *Hexum*.  Based on discussions with Lilly's counsel, Lilly apparently does not have the ability to search the emails of all 30,000+ employees at Lilly in a single search.  Instead, to search for emails, the parties must first identify specific "custodians" and run search term strings on those specific email accounts.

In Lilly's previous document production in *Herrera* and *Hexum*, Lilly identified nine individuals, in company that employees over 30,000 employees worldwide, and ran a specific search string on those accounts.  (Exh. 8.)  Plaintiffs submit that this search was insufficient. Limiting the search of internal communications to only nine "custodians" means significant internal communications related to Cymbalta withdrawal were never produced.

The parties discussed this issue on March 17, 2015.  Based on a review of the documents, Plaintiffs identified over 275 individuals who likely have relevant emails about Cymbalta

withdrawal.  Plaintiffs' counsel then culled that number down to 135 names.   Lilly, however,

refused to search that many email accounts, and only offered to search two additional email

accounts.  The parties agreed that Lilly would conduct two additional custodian searches and

produce documents by April 3, 2015.  On the remaining list of custodians, Plaintiffs would file a

motion to compel.  (Exh. 9.)

Having culled the number of potential custodians down to 135 individuals, Plaintiffs'

counsel now further culls the list to 31 "Tier One" individuals.  And, since two of these

individuals Lilly has already agreed to search, i.e. Micahel Detke and Torkil Fredborg, this

motion only seeks production of emails for the following 29 individuals:

| | | |
|---|---|---|
| Andrew Buchanan | Joel Raskin | Phyllis Barkman Ferrell |
| Angela Wade | John M. Plewes | Richard Bump |
| Antonio Stefano Crucitti | Louise M. Spruce | Steve Sugino |
| Beatrice Grimault | Madelaine M. Wohlreich | Steven Knowles |
| Carol H. Stephens | Marcia Vowles | Susan G. Ball |
| Carole Boylan | Matt Kuntz | Tim Garnett |
| D. Mark Gapinski | Melissa J. Joliat | Timothy M. Conrad |
| Daniel K. Kajdasz | Michael J. Robinson | Virginia L. Wyss |
| Durisala Desaiah | Michael P. Roesner | William G. Losin |
| Joe Wernicke | Patriza Cavazzoni | |

(See Exh. 10.)

Lilly refuses to produce these documents for two reasons—both of which are unavailing.

First, Lilly argues that the burden of conducting these searches is not justified for only two

personal injury cases.  But, this discovery is not only for these two cases, but would apply

equally to the 159 plaintiffs around the country that have filed nearly identical claims.  As Judge

Trenga explained in his March 3, 2015 Order, he deferred ruling on Plaintiff's motion to transfer,

in part, to allow "complete discovery on common issues that will be useable in all Cymbalta

withdrawal cases[.]"  (Dkt. 32 at 9.)   Considering the volume of cases to which this requested

discovery would apply, asking Lilly to run email searches on a 29 additional Lilly employees is

hardly excessive.

Second, Lilly argues that there is simply not enough time to complete this volume of discovery considering the relative expedited discovery schedule in this Court. This argument, however, should be disregarded. Plaintiffs gave Lilly an opportunity to transfer this case to the Southern District of Indiana—one that is 1.5 miles from Lilly's headquarters in Indianapolis. Lilly, however, vigorously opposed any transfer and demanded to litigate these cases in this district, citing the fact that it will obtain a faster resolution because of the Court's expedited schedule. Lilly should not be able to now use that fact to shield against producing documents. Lilly made its bed, now it has to sleep in it.

It is undisputed that this discovery request is reasonably calculated to lead to discoverable information. The individuals identified are key players in the Cymbalta litigation saga. Obtaining emails that these people related to Cymbalta withdrawal is exactly the type of information that should be the subject of common discovery. Plaintiffs request that the Court enter an order compelling production of emails for these individuals.

## III.   RFP No. 96:  Production of Plaintiff's Medical Records in Lilly's Possession

RFP No. 96 States:

> Please produce all records in YOUR possession related to Plaintiff. Please note that this request is in no way limited to medical or psychiatric records, but includes any DOCUMENTS obtained from a third-party by LILLY about the Plaintiff.

(Exh. 1-A at 25.) The purpose of this request is to have Lilly produce any documents that may it have obtained using the various authorizations Plaintiffs provided to Lilly a. Plaintiffs have already produced those records in thier possession and supplied Lilly with medical authorizations to obtain additional records free of charge. Independently, Lilly has subpoenaed various medical providers to collect records. Plaintiffs believe they are entitled to have a copy of any

discoverable records Lilly obtains, just as Lilly has a right to any discoverable records Plaintiffs obtain.

Lilly, however, objects to producing any records it obtains about Plaintiffs pursuant to the medical authorizations they provided.  Previously, Lilly asked Plaintiffs if they wanted to share in the costs of collecting medical records, and Plaintiffs declined.  Plaintiffs did not believe they were required to subsidize *Lilly's* record collection efforts.  Lilly often casts a very wide net in collecting records, seeking information that is often irrelevant.  Nothing in the rules or law requires Plaintiffs to aid a defendant in that effort beyond providing, when appropriate, a medical authorization.  Based on this refusal, Lilly takes the position that it does not have to produce any records Lilly obtains.  This is deeply flawed.

First, Plaintiffs' discovery requests are valid regardless of whatever method Lilly used to obtain records.  Nothing allows Lilly to withhold disclosure of records that are not-privilege and clearly relevant, regardless of how those records are obtained.  To hold otherwise would allow litigants to hide non-privilege information from each other, undermining the purpose of the discovery rules:

> The federal rules promote broad disclosure during discovery so each party can evaluate the strength of its evidence and chances of success.  This makes a trial "less of a game of blind man's bluff and more of a fair contest." *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682 (1958).  One court notes, "the purposes of Rule 26 are to eliminate secrets and surprises at trial, clarify and delineate the issues, and facilitate equitable settlement." *Blount v. Wake Elec. Membership Corp.,* 162 F.R.D. 102, 104 (E.D.N.C.1993) (*citing* 6 Wright & Miller, § 2001 (1970)).

*Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 437 (D. Md. 2006).  Allowing a defendant to not produce medical records because Plaintiffs did not subsidize the defendant's effort to collect them would perpetuate the sort of lack-of-transparency the rules seek to abolish.

Second, by their very nature, any documents obtained using Plaintiffs' authorizations

contain privileged material.  Plaintiffs have allowed a limited waiver of that privilege by providing authorizations to Lilly.  If, however, documents are obtained that should not have been, Plaintiffs cannot actively protect their privilege without having access to them.  Plaintiffs never intended to allow a defendant to go a secretive goose chase into her medical history, untethered to the facts of the case.

Finally, Plaintiffs are fully willing to pay for the costs of copying any records in Lilly's possession (assuming they cannot just be emailed).  Thus, Lilly is not prejudiced or burdened with any addition expense by having to respond to this request.  Lilly simply just has to give Plaintiffs a copy of whatever they have.  Plaintiffs request that the Court enter an order compelling production of any discoverable records within Lilly's possession that relate to Plaintiff.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion to compel.

DATED:  March 20, 2015                    Respectfully submitted,


/s/ Brielle M. Hunt
Brielle M. Hunt
MILLER LEGAL LLC
Va. Bar 87652
175 S. Pantops Drive, Ste. 301
Charlottesville, VA 22911
Tele (434) 529-6909
Fax (888) 830-1488
bhunt@millerlegalllc.com

17

R. Brent Wisner, Esq. *(pro hac vice)*
BAUM HEDLUND ARISTEI &
GOLDMAN, P.C.
12100 Wilshire Blvd., Ste. 950
Los Angeles, CA 90025
Tele (310) 207-3233
Fax (310) 207-4204
rbwisner@baumhedlundlaw.com

*Attorneys for Plaintiffs Janine Ali and Gilda Hagan-Brown*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of March, 2015, a true copy of the foregoing

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL was filed

electronically with the Clerk of Court using the CM/ECF system, which will send a notification

of such filing to the following:

Jeffrey Todd Bozman
Michael X. Imbroscio *(pro hac vice)*
Phyllis A. Jones *(pro hac vice)*
Brett C. Reynolds *(pro hac vice)*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tele (202) 662-5335
Fax (202) 778-5535
jbozman@cov.com

/s/ Brielle M. Hunt
Brielle M. Hunt
MILLER LEGAL LLC
Va. Bar 87652
175 S. Pantops Drive, Ste. 301
Charlottesville, VA 22911
Tele (434) 529-6909
Fax (888) 830-1488
bhunt@millerlegalllc.com