# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| JANINE ALI | CASE NO.: 1:14-CV-01615 |
| Plaintiff, | |
| v. | |
| ELI LILLY AND COMPANY, an Indiana corporation, | |
| Defendant. | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 37

## PRELIMINARY STATEMENT

Plaintiff Janine Ali's expert witness Joseph Glenmullen has opined that Cymbalta caused Ms. Ali to attack her husband, prompting him — in Dr. Glenmullen's shocking view — to justifiably hit her back. This claim is directly refuted by the police report documenting the incident, which documents that her husband "became upset, grabbed Mrs. Ali by the breast and threw her into the couch. Ms. Ali also stated that the suspect hit her in the head." Even after being shown this report, Dr. Glenmullen adhered to his medieval view that the husband's conduct in grabbing his wife's breast, throwing her to the couch, and striking her in the head was entirely justified by Ms. Ali's alleged Cymbalta-induced disagreeableness.

In a maneuver to keep Ms. Ali's police report from the jury, Plaintiff has filed a strategic motion for sanctions that if granted would effectively allow her expert to offer his false view of the facts without challenge. Her justification for this extraordinary request is that Defendant Eli Lilly and Company ("Lilly") did not provide her a copy of the police record earlier. But Lilly acted entirely reasonably: shortly after Ms. Ali revealed this incident for the first time during her deposition on April 8, 2015, Lilly dispatched a courier to the Arlington County Courthouse to obtain any publicly available court records about this incident. The court file, of course, is a public record and any member of the public can obtain a copy without any written authorization or even a subpoena — unlike the medical records that Plaintiff earlier sought through the motion to compel that she now tries to stretch into an obligation for Lilly to instantly produce any publicly available document it has obtained. In his June 1, 2015 deposition, Dr. Glenmullen expressed his opinion that Ms. Ali effectively was asking to be abused because of her Cymbalta-induced irritability, and it became clear only then that Lilly would need to use the public record to impeach Dr. Glenmullen's remarkable version of events.

Moreover, even if Plaintiff could show that Lilly should have provided a copy of the public report earlier, she certainly cannot show bad faith or prejudice. To the contrary, counsel examining Dr. Glenmullen provided a copy of the report when asked. Showing the complete lack of prejudice, Dr. Glenmullen simply rejected the report out-of-hand and doubled down on his view that Mr. Ali was justified in physically abusing his wife by Ms. Ali's conduct, which in turn he blamed on Cymbalta. Moreover, even if Dr. Glenmullen had decided to change his opinion, it is not legal prejudice to be precluded from presenting a false picture to the jury.

On these facts, exclusion and sanctions are inappropriate. Assuming Dr. Glenmullen survives *Daubert* scrutiny and is allowed to testify before a jury, the jury should be fully informed about police records that directly refute his views.

## **BACKGROUND**

Plaintiff Janine Ali began taking Cymbalta on May 1, 2012. She took Cymbalta under the care and guidance of her rheumatologist, Dr. Navera Ahmed, until sometime in July 2012 when, without consulting Dr. Ahmed, Ms. Ali stopped taking Cymbalta. She alleges that she then experienced a variety of symptoms stemming from her discontinuation of the medicine. On August 3, 2012, in the same timeframe that Ms. Ali was allegedly suffering symptoms related to her discontinuation of Cymbalta, Ms. Ali called the Arlington County police to her house following a domestic dispute. Ms. Ali reported to the police that her husband "became upset, grabbed Mrs. Ali by the breast and threw her into the couch. Ms. Ali also stated that the suspect hit her in the head." Declaration of Brett Reynolds ("Reynolds Decl."), Ex. 1. The police arrested Mr. Ali for domestic abuse and took him to jail.

Ms. Ali filed her lawsuit in this matter on November 26, 2014. Her complaint contained no allegations relating to the domestic violence incident, nor did she disclose this incident and its alleged connection to her Cymbalta discontinuation in her written discovery responses. When

Ms. Ali gave her deposition on April 8, 2015, Lilly's counsel asked her to describe the symptoms that she started to experience following discontinuation of Cymbalta.  Despite having been asked essentially the same question in written discovery without disclosing this incident,[1] in her deposition she revealed for the first time the domestic violence incident:  "I was having — I was very violent and push — I pushed him, and he returned the push or — I hit him and he hit me back, and then I called the police on him."  Reynolds Decl. Ex. 2 (Deposition of Janine Ali) at 172, 186-187.  Ms. Ali testified that her husband was not injured during the incident.  *Id.* at 193.

---

[1]  On January 12, 2012, Lilly served discovery on Ms. Ali, including a broad interrogatory seeking any condition she attributed to her discontinuation of Cymbalta:

> Describe each injury, illness, disease, or other condition that you attribute to Cymbalta, including the nature of the injury, illness, disease, or other condition, all symptoms you experienced or are currently experiencing that you attribute to Cymbalta, the date of onset of each symptom, a detailed description of any medical treatments associated with the alleged injury, the full name of any medical professional who diagnosed, evaluated, or provided medical treatment to you in relation to the alleged injury, your prognosis, and your need for future medical treatment. (Interrogatory No. 5)

On February 17, 2012, Ms. Ali served verified responses to Lilly's interrogatories.  Nowhere in those responses did she reference the domestic violence incident that she now attributes to her discontinuation of Cymbalta or even alleged symptoms that might be associated with her version of the incident, such as anger issues or violent outbursts.  Her verified response to the interrogatory in relevant part as follows:

> Within 2-3 days of of [sic] reducing her Cymbalta dosage, Plaintiff suffered severe and progressively worsening insomnia, then nightmares when she was able to get sleep.  She was having "out-of-body" experiences, deep depression, anxiety and panic attacks, mood swings, fatigue, dizziness, blurred vision and uncontrollable crying.  Plaintiff started wanting to commit suicide.  These symptoms lasted for several months.  Dr. Navera Ahmed was informed of the side-effects Plaintiff was experiencing and was and was [sic] treating her during that time.

At her deposition, Ms. Ali admitted that at least three statements in this single interrogatory response were false.  First, she testified that her symptoms began within 2 to 3 weeks of reducing her Cymbalta dosage.  Reynolds Decl. Ex. 2 at 180. Second, she testified that she had never wanted to commit suicide.  *Id.* at 181.  Third, she testified that she had not informed Dr. Ahmed of the side-effects while she was experiencing them and that Dr. Ahmed did not treat her during that time.  *Id.*  Ms. Ali admitted to several other false statements in her verified interrogatory responses as well, only a few of which have been amended or supplemented.  Ms. Ali could not provide any explanation for her repeated false statements in her verified responses.

Ms. Ali further explained that although she later "cooled down" and "dropped the case," she went to see a divorce lawyer about a month later and paid a fee because she was "getting ready to divorce my husband because of this [incident]." *Id.* at 189.

Following the deposition, on April 8, 2015, Lilly's counsel contacted Ms. Ali's counsel and made the following request for documents: "As we discussed following the deposition of Mrs. Ali, we request that you produce any and all documents in Mrs. Ali's possession, custody, or control regarding: 1.) the arrest of Mrs. Ali's husband; 2.) Mrs. Ali's contact or consultation with a divorce attorney; and 3.) Mrs. Ali's family trip to Florida." Reynolds Decl. Ex. 3 (Email Chain Between Brian Stekloff and R. Brent Wisner). On April 13, 2015, Lilly's counsel followed up on the April 8, 2015 email, having never received a response. *Id.* On April 14, 2015, Ms. Ali's counsel responded as follows: "Mrs. Ali will have what information is available to me by the end of the week and I will have it to you shortly after that. My discussion with her revealed the following; 1.) the arrest of Mrs. Ali's husband; She has no file on this. 2.) Mrs. Ali's contact or consultation with a divorce attorney; and All she has is contact info 3.) Mrs. Ali's family trip to Florida. Is still looking and believes she will locate." *Id.*

Although Lilly had requested documents in her possession, custody, and control, which would include any documents she provided to her divorce attorney, Ms. Ali's counsel has since admitted that they never contacted Ms. Ali's divorce lawyer to determine whether he or she possessed the arrest report or any documents, including notes, regarding the domestic violence incident. Ms. Ali's counsel further indicated that they were unwilling to do so. Reynolds Decl. Ex. 4.

On April 15, 2015, having just learned of the domestic violence incident a week prior and having been informed that Ms. Ali and her counsel had no records related to the incident, Lilly

sent a courier to the Arlington County Courthouse and obtained a copy of the court file attached as Exhibit 1.  Neither a subpoena nor a signed authorization by the plaintiff were necessary for Lilly to obtain these public court records.

On May 14, 2015, Ms. Ali served on Lilly the report of Dr. Joseph Glenmullen, Plaintiff's causation expert.  The bulk of Dr. Glenmullen's report is a recitation of deposition quotes from Ms. Ali, including testimony regarding the domestic violence incident.  Citing an unrecorded interview that he had with Ms. Ali, Dr. Glenmullen stated in his report that "Janine had no prior history of anger outbursts or violence.  She is normally a calm, peaceful person." He made no other reference to the incident in his report, although he did attribute her "irritability with sudden outbursts of anger ('anger attacks' that were at times violent)" to her discontinuation of Cymbalta.

In advance of the parties' joint motion to extend the discovery deadline by two weeks, counsel discussed the timing of Dr. Glenmullen's deposition.  Lilly's counsel was informed that Dr. Glenmullen would be out of the country until May 27, and, therefore, his deposition would need to take place on May 28 or May 29 — the last two days of the proposed new discovery deadline.  ECF No. 80 at ¶¶ 4, 7.  Later in May, however, Plaintiff's counsel informed Lilly's counsel that although returning on May 27, Dr. Glenmullen would not be able to sit for a deposition prior to the close of discovery, and asked whether Lilly would consent to take Dr. Glenmullen's deposition the next business day after the end of the discovery period, on June 1, 2015.  Lilly did not oppose Plaintiff's request, and the parties submitted a joint motion seeking the court's permission to hold Dr. Glenmullen's deposition on June 1.  ECF No. 90.

With the Court's approval, Lilly deposed Dr. Glenmullen on June 1, 2015.  At his deposition, Dr. Glenmullen painted a substantially different and unsupported picture of the

domestic violence incident than had Ms. Ali.  Dr. Glenmullen testified in relevant part as

follows:

> And in particular, with her husband, to the point where she
> assaulted him. He pushed her back in self-defense. She called the
> police. The police actually arrested him.
>
> Q So whatever happened -- Was this event an event of domestic
> violence?
>
> A No.
>
> Q Is it domestic violence for a man to physically push his wife?
>
> MR. POGUST: Objection.
>
> A Not in self-defense when she's off the walls because of
> Cymbalta withdrawal and nobody -- they didn't even understand
> that.
>
> Q So is it your view that him pushing her was in self-defense and
> nothing more?
>
> A Yeah, yeah.
>
> Q And is that a credibility factual determination you're making?
>
> A Yes. Probably trying to protect her as much as himself.  She
> testified we were all -- the son testified very clearly, "We were all
> totally confused.  We didn't understand what was happening with
> her."

Reynolds Decl. Ex. 5 at 164-65.

Dr. Glenmullen further testified that he had asked Ms. Ali's attorneys "if you guys had

gotten [the police report], if anybody had gotten it.  I was told not yet." *Id.* at 156.  He then

testified that he did not feel he needed the police report to offer his opinion about the incident.

Following a lunch break, the Lilly attorney taking the deposition learned that Lilly had

obtained the court file and provided a copy to counsel for Ms. Ali.  Dr. Glenmullen was then

given an opportunity to review the court file, including the criminal complaint.  The publicly

available complaint painted a radically different picture of the altercation.  According to the

criminal complaint, Officer McCollum arrived at Ms. Ali's home and was informed by her that

"she had gotten into an argument with her husband, Mr. Ali over a shopping issue.  The suspect

became upset, grabbed Mrs. Ali by the breast and threw her into the couch.  Ms. Ali also stated

that the suspect hit her in the head.  Mr. Ali admitted to pushing her but nothing else."  Officer

McCollum observed that Ms. Ali "had bruising on her right breast and a red mark on the back of

her neck."  Pictures of Ms. Ali's injuries were taken, as were statements of the witnesses, and

Mr. Ali was placed under arrest.  On September 18, 2012, the case against Mr. Ali was nolle

prossed.  Mr. Ali passed away in 2013.  Contrary to Ms. Ali's deposition testimony, the records

did not in any way indicate that the domestic violence incident related to Ms. Ali's use or

discontinuation of Cymbalta, nor do they document her committing any act of violence despite

reflecting interviews with both the husband and the wife.

       Remarkably, nothing in the complaint changed Dr. Glenmullen's view of the incident:

> Q If she was describing it accurately on August 3rd, that he
> grabbed her by the breast and threw her into the couch, he also hit
> her in the head, is that consistent with him acting in self-defense, in
> your view?
>
> MR. POGUST: Objection.
>
> A You know, when he pushed her he could have pushed -- bumped
> her in these ways. To me, this is great corroboration of her
> testimony.  It's exactly the right time frame.  It's -- you know, she
> wasn't going to call the police and then say "It's my fault." She
> didn't fully understand it was her fault at the time.  So I think it's
> very helpful to have this.
>
> Q This is great corroboration of her testimony?
>
> A Yeah.
>
> Q Okay. Reading what we've just read, do you still think that Mr.
> Ali bears no responsibility for his actions towards Ms. Ali on this
> day, August 3rd, 2012?
>
> MR. POGUST: Objection.

> A She was having terrible irritability as part of Cymbalta withdrawal and anger attacks. She says she provoked this. She says she pushed or hit him first. If he did this in self-defense -- again, the son's testimony is very consistent with this. He went to his son and said, "I don't know what's happening with your mom." So he's not standing there thinking, oh, she's in Cymbalta withdrawal. I should treat her with kid's gloves. He's seeing his wife angry and irritable in a way that he's never seen her before, and he's trying to protect himself and her from escalating this any more.

Reynolds Decl. Ex. 5 at 189-90.

Dr. Glenmullen went as far as to make findings to a reasonable degree of medical certainty about what happened during the incident even though he was not a witness to it:

> Q I get the qualifiers. Please answer my question. Did he punch her in the head? Yes or no.
>
> MR. POGUST: If you know.
>
> Q If you know. If you don't know, tell me. That's what I'm trying to get at.
>
> A To a reasonable degree of medical certainty, based on her testimony and this, I don't think he punched her in the head. I think he hit her head as part of pushing her.
>
> Q Okay. Did he grab her breast? Yes or no.
>
> A Again, to a reasonable degree of medical certainty, he pushed -- as part of pushing her, he, quote, grabbed, closed quote, her breast.

*Id.* at 195.

Dr. Glenmullen ultimately concluded that Mr. Ali's abuse of his wife was justified by her Cymbalta-induced condition:

> Q So what he did was solely prompted by her conduct. Correct?
>
> A But for Cymbalta withdrawal, this would not have happened.
>
> Q Was what he did justified by her conduct?
>
> A Since they'd never had an incident before like this, I presume. I don't know. I wasn't there.

Q But you presume?

A Yeah.

*Id.* at 198-99.

*        *        *

Plaintiff has responded to this report by seeking to exclude it, arguing that Lilly should have produced it in response to a much earlier discovery request.  Specifically, on March 20, 2015, well prior to the time that Lilly first learned of the domestic violence incident at Ms. Ali's deposition, Ms. Ali filed a motion to compel, including a motion to compel the production of documents responsive to Ms. Ali's Request for Production No. 96.  In the motion, Ms. Ali stated, "[t]he purpose of this request is to have Lilly produce any documents that may it have obtained using the various authorizations Plaintiffs provided to Lilly a [sic]."  ECF No. 37 at 15.  Indeed the central focus of that entire portion of Plaintiff's motion was on medical records obtained using signed authorizations (which permit medical providers to release records without violating HIPAA and other privacy protections) provided to Lilly by Plaintiff.[2]

The Court held a hearing on the motion to compel on April 3, 2015.  As with the written motion, the hearing centered on medical records obtained using Plaintiff's signed authorizations.  For example, when first raising the topic of RFP 96, Plaintiff's counsel stated:

> All right. The last document request is I think sort of a no-brainer in my head, in my opinion. And that is, please give me what documents you got using our authorizations.

Plaintiff's counsel later reiterated the focus of Plaintiff's motion to compel:

---

[2] In the same vein, the motion also explained that Plaintiff sought copies of medical records obtained by Lilly using Plaintiff's signed authorizations so that Plaintiff could evaluate whether such records were legally privileged.  *See* Pls. Mem. at 16-17 (explaining that "by their very nature, any documents obtained using Plaintiffs' authorizations contain privileged material," and that receiving copies would allow Plaintiffs to evaluate whether to make a delayed privilege assertion).

> We have produced every document that we have, couple hundred
> pages of medical records that we collected before we filed suit.
> We have since collected more records.  We've supplemented them
> in discovery responses, the things that Lilly has asked us to do.
> We are just asking them to do the same.  Now, they want to go and
> collect records from some physician that had nothing to do with
> Cymbalta, fine, we gave them authorizations to go do that. But we
> want a copy of whatever you get.  I mean, those are my clients'
> records.  And we gave them those authorizations under the
> assumption that we would get a copy of it.

Similarly, the exchange between Lilly's counsel and the Court focused entirely on

medical records:

> THE COURT:  Now to the medical records.
>
> MR. IMBROSCIO: Yes, Your Honor.
>
> THE COURT: What's the big deal with the medical records?
>
> …
>
> THE COURT: Okay. I think I -- on the medical records issue --
> and I, you know, I'm sympathetic to both sides on that argument.
> But I think given the situation here, I am going to require you to
> produce the records.  They are going to have to pay for the
> administrative costs -- I mean, if there is costs of you sending them
> out to a vendor to get them copied or anything else, they will have
> to pay those administrative costs along with the copying costs.  But
> I am not going to require them to pay half of the vendor fees for
> subpoenaing the records and getting them.

## **LEGAL ARGUMENT**

Plaintiff asks this Court to impose sanctions under either Rule 37(b) or Rule 37(c)(1).

Under the governing law of this Court and the Fourth Circuit, such sanctions are entirely

unwarranted where, as here, there is no demonstration of bad faith, no showing of prejudice to

the moving party, and no unfair surprise.  This Court should deny Plaintiff's motion.

## I.  **Rule 37(b) Sanctions Are Not Warranted**

Plaintiff's motion launches directly into the standards for certain discovery sanctions —

sanctions which are available *only if* a party failed to disclose a document pursuant to court

order.  But Plaintiff's motion spends no time discussing the predicate for such sanctions — that

the nonmoving party has been ordered to disclose the document in question.  When read properly

and in context, however, Lilly was entirely reasonable in believing that this Court's order, which

was an order on a motion to compel that focused on medical records, and specifically medical

records obtained using signed authorization forms provided by Plaintiff, did not apply to the

later-retrieved publicly-available court file.  *See* ECF No. 37 at 15 ("The purpose of this request

is to have Lilly produce any documents that it may have obtained using the various

authorizations provided to Lilly.").  Plaintiff argues that because the text of the Court's order on

Plaintiff's motion, read in isolation, could encompass the publicly-available police report that

Lilly used to impeach Plaintiff's expert at deposition, *see* ECF No. 50, the context of the motion

and hearing relating to medical records is irrelevant.

   Not so.  The unequivocal relief sought in Plaintiff's motion, the argument before this

Court, and related correspondence between counsel for the parties all focused on medical records

being collected by Lilly pursuant to Plaintiff's authorizations, which are not public documents

and can only be obtained through service of a valid subpoena and a medical release authorization

signed by the Plaintiff.  *See* ECF No. 37 at 15-16.  Collection of such medical records also

involves unique privacy issues, which Plaintiff emphasized in her motion to compel.  *See id.* at

16-17 ("[A]ny documents obtained using Plaintiffs' authorizations contain privileged material.

Plaintiffs have allowed a limited waiver of that privilege by providing authorizations to Lilly.").

This context and singular focus on medical records allows a reasonable inference that Plaintiff

and her counsel were not hiding an elephant in a mousehole — *saying* that they sought

production of medical records, but *meaning* that they sought production, upon penalty of forfeit,

of *any* conceivably-relevant document, even if it is publicly available and accessible to both

sides.  *See Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1 (D.D.C. 2007)

("Typically, courts do not order discovery of public records which are equally accessible to all

parties."); *Valenzuela v. Smith*, 04-cv-0900, 2006 WL 403842 at *2 (E.D. Cal. Feb. 16, 2006)

("Defendants . . . will not be compelled to produce documents that are equally available to

plaintiff."); *Secs. & Exch. Comm. v. Samuel H. Sloan & Co.*, 369 F. Supp. 994 (S.D.N.Y. 1973)

("It is well established that discovery need not be required of documents of public record which

are equally accessible to all parties.").  For this reason, Lilly's position that the Court's order

concerned medical records and did not encompass other publicly available materials counsel has

collected is a reasonable one.  And there is no dispute that Lilly *has* fully complied with the

Court's April 3, 2015 order insofar as it concerns medical records.  *See* Pls. Mem. at 2.  This is

not a case of deliberate disobedience.

  Even if this Court's April 3, 2015 order *can* be said to have included the police report, no

sanctions are appropriate.  The Fourth Circuit has articulated a four-part test to determine what,

if any, sanctions are appropriate under Rule 37(b):

> (1) whether the non-complying party acted in bad faith;
>
> (2) the amount of prejudice that non-compliance caused the adversary;
>
> (3) the need for deterrence of the particular sort of non-compliance; and
>
> (4) whether less drastic sanctions would have been effective.

*Southern States Rack and Fixture, Inc. v. Sherwin-Williams, Co.*, 318 F.3d 592, 597 (4th Cir.

2003).  Although Plaintiff's motion only cites one possible sanction, *see* Pls. Mem. at 6, district

courts have "wide discretion" in determining whether any sanction is appropriate.  *Mut Fed. Sav.*

*& Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).  Indeed, Rule 37

itself provides seven examples of possible sanctions but indicates that they are only examples.

*See* Fed. R. Civ. P. 37(b)(2)(A) (sanctions "*may include* the following…"). In this case, even assuming that Lilly's production of the Ali police records to impeach Dr. Glenmullen's testimony one day after the close of discovery violated this Court's Order, none of the four *Southern States* factors weighs in favor of imposing sanctions.

    <u>Plaintiff Cannot Show Bad Faith.</u> Although bad faith and sanctions have been litigated in this district and this circuit countless times, Plaintiff's motion does not cite a single case in connection with her assertion that Lilly acted in bad faith. (Indeed, apart from setting out the four-part standard, Plaintiff's motion does not cite any law in connection with her 37(b) discussion, either by way of analogy or to further articulate how this Court should evaluate the four *Southern States* factors.) Even setting aside the fact that Plaintiff's bad faith argument is untethered to any applicable law, the facts alleged in the bad faith portion of Plaintiff's brief focus not on Lilly's conduct concerning production of the police records, but on Lilly's communications with Plaintiff's counsel in the meet-and-confer process leading to the instant motion. *See* Pls. Mem. at 7. Rather than point to any bad faith in Lilly's supposedly improper failure to produce the records in the first place, Plaintiff references Plaintiff's own prior motions and an email exchange between counsel for both parties during the parties' process of attempting to resolve this dispute without the Court's intervention.[3] The email exchange between counsel,

---

[3] Plaintiff also offers that Lilly's "decision not to produce the document was willful, i.e. Lilly deliberately decided not to produce the document . . ." Pls. Mem. at 7. The assertion is tautological and would render "willful" meaningless by making every action or inaction by a party "willful." In any event, the cases in this Court and the Fourth Circuit interpreting the meaning of "willful" in this context have described it in terms of "willful *disregard*" of court orders, not simply any conduct that can be described as action or inaction. *See Rosemond v. United Airlines, Inc.*, 2014 WL 4245974 (E.D. Va. 2014) (Anderson, M.J.) ("Indeed, the Fourth Circuit has held that a plaintiff's 'utter disregard for the district court's discovery timetable set forth in the pretrial order' may constitute willful disregard and bad faith sufficient to uphold a 37(b) dismissal.") (citing *Raab v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir. 1985) (finding (continued…)

in which Lilly's counsel sketched the very arguments that Lilly makes here, are entirely inapplicable to the question presented here — whether Lilly's conduct related to production of the police report was *itself* in bad faith.  And as detailed above, even if Lilly should have provided a copy of the court records earlier, which Lilly insists is not the case, any such impropriety stems not from bad faith but from Lilly's reasonable and well-founded view that the parties' focus was on medical records collected using Plaintiff's signed authorization forms, not on publicly-available documents like the police report, which did not become relevant to Plaintiff's use of Cymbalta until Dr. Glenmullen introduced the point at his deposition.  Bad faith requires much more.  *See Flame S.A. v. Industrial Carriers, Inc.*, 39 F. Supp. 3d 752, 764 (E.D. Va. 2014) ("[R]epeated abuses [of the court's discovery orders] support a finding of bad faith."); *Plant v. Merrifield Town Ctr. Ltd. P'ship*, 711 F. Supp. 2d 576, 587 (E.D. Va. 2010) ("[B]ad faith is clearly evidenced by the repeated and flagrant disregard for the binding orders of the magistrate judge and plaintiffs' counsel's misrepresentation of material facts concerning plaintiffs' noncompliance with these orders.").

      <u>Plaintiff Has Not Demonstrated Any Prejudice.</u>  The essence of Plaintiff's motion is that Lilly would have been in compliance — and the parties would not be needlessly briefing this motion — if the document had been turned over to Plaintiff one business day earlier, i.e., on May 29 (the close of discovery).  *See* Pls. Mem. at 2 ("This document, however, had not been produced by Lilly prior to the close of discovery.").  But the severe imposition of sanctions cannot be based on such a technicality.  Moreover, Plaintiff ignores the fact that the only reason that Dr. Glenmullen's deposition took place outside of the discovery period was to accommodate

---

willful conduct where plaintiff "deliberately disregarded" a pretrial order after counsel "conceded full awareness" of the scope of the court's order but did not comply).

Dr. Glenmullen's vacation at Plaintiff's request, after Lilly was originally told that Dr.

Glenmullen could be deposed on May 28 or May 29.

Even Plaintiff acknowledges that any prejudice is "not substantial" and that Plaintiff

could have obtained the document independently.  Once again, however, Plaintiff ignores the

history of the case in asserting any alleged prejudice.  Plaintiff did not raise the domestic

violence incident in her complaint or discovery responses.  Plaintiff — not Lilly — made it part

of the case when she raised it for the first time at her deposition when asked what symptoms she

began experiencing following her discontinuation of Cymbalta.  Following Ms. Ali's deposition,

Lilly asked Plaintiff to obtain any records in her possession, custody, or control relating to Mr.

Ali's arrest.   It is clear now that she did not do so because she did not even contact her divorce

attorney, as Lilly had specifically requested, to see if he or she possessed the police report or any

other documents associated with the arrest.  And, at that point, although Lilly obtained the record

on its own, in Lilly's view the record merely constituted potential impeachment material.  *See*

Fed. R. Civ. P. 26(a)(3)(A) (party not obligated to disclose documents it may present at trial

solely for impeachment).  That impeachment material then became necessary when Dr.

Glenmullen provided distorted testimony about the incident at his deposition.[4]

In fact, the prejudice alleged by Plaintiff — an inability to address the document or rebut

it — is belied by the record.  In her motion, Plaintiff acknowledges that the document does not

impact Dr. Glenmullen's testimony:  "Plaintiff strenuously disputes Lilly's characterization

about how this document relates to the merits of Dr. Glenmullen's opinion — it does not

contradict anything."  Pls. Mem. at 6.  Dr. Glenmullen's testimony only furthers this point.  He

---

[4] In footnote 2 of her brief, Plaintiff notes that Lilly's experts did not review the court
records.  This is true and further supports the notion that (i) the document was only viewed as
potential impeachment material; and (ii) Lilly did not act in bad faith.

was given the opportunity to review the document and address it at his deposition.  Rather than acknowledge that the facts in the criminal complaint are at odds with Plaintiff's testimony about the incident, Dr. Glenmullen repeatedly and unambiguously testified that the document corroborated his opinion that Plaintiff caused Mr. Ali to hurt Plaintiff in an appropriate act of self-defense.  Reynolds Decl. Ex. 5 at 183-84.  After reading the criminal complaint, Dr. Glenmullen went even further in advocating that Mr. Ali was acting in self-defense than he had done prior to reading the criminal complaint by testifying "to a reasonable degree of medical certainty" that the events in the criminal complaint did not occur as described in the record and that Mr. Ali's conduct was *justified* by Plaintiff's actions.  *Id.* at 195-96.  In essence, by seeking to exclude the publicly available court document from the case, Plaintiff is seeking to perpetrate a fiction on the jury by allowing Dr. Glenmullen to offer his one-sided, biased, and, frankly, offensive opinion regarding the domestic violence incident without allowing the complete facts of the incident to be heard.  In other words, this motion only seeks to prejudice the jury from engaging in its fact-finding role by hearing all of the relevant facts.

      <u>There Is No Need to Deter Non-Compliance.</u>  There also is no need to deter Lilly from non-compliance.  In addition to the fact that discovery is now closed in this case, Lilly has consistently demonstrated its willingness and ability to comply with its discovery obligations in this case.  In this case and the related *Hagan-Brown* matter, Lilly has produced over one million pages of discovery (in addition to the nearly two million pages produced in related litigation in California which the parties may, by stipulation, use here as well), presented four company witnesses for depositions (in addition to those already deposed in the California cases), responded to numerous interrogatories and requests for admissions, and produced the eCTD file as ordered by the Court, all at great expense that easily outstrips the reasonable value of these

two cases.  And Lilly has of course produced, as directed, all of the medical records it has obtained using Plaintiff authorizations to Plaintiff upon receipt.  Thus, the record in this case demonstrates that Lilly complied (and continues to comply) with its discovery obligations, even given what Plaintiff describes as the "fast-paced nature of litigation within this Court."[5]  Pls. Mem. at 8.  Plaintiff, for her part, offers no justification for this Court to deter Lilly's alleged non-compliance other than the circular statement that deterrence is necessary because "Lilly's failure to comply is inexcusable and should be deterred."  *Id.*  That rationale holds no water, and is a far cry from the need for deterrence articulated in other cases in this Court.  *See, e.g., Plant v. Merrifield Town Ctr. Ltd. P'ship*, No. 08-cv-374, 2009 WL 6082878 (E.D. Va. Dec. 23, 2009) (Anderson, M.J.) (finding need to deter where "[t]he disobedient plaintiffs in this case have not just dragged their feet in discovery or been slow to produce responses.  Rather, they have willfully and consistently stood in complete defiance of the Federal Rules and have failed to comply in any way with the Orders of this court.").

Less Drastic Sanctions, if Any, Would Be Effective.  Finally, Plaintiff's supposition that exclusion is the least drastic sanction available that would not prejudice Lilly in any significant way is preposterous.  The only step Plaintiff suggests she may have taken if she had the document earlier is that she may have deposed the arresting officer.  To be clear, while any sanction is wholly inapplicable and unnecessary for the various reasons described above, Lilly would have no objection to the Court allowing Plaintiff to take the deposition of the arresting

---

[5] Plaintiff's allegations in footnote 3 regarding a similarly-misplaced sanctions motion in California lacks all context and aptly reflects Plaintiff counsel's trigger-happy willingness to lob serious allegations of misconduct without reasoned justification.  Lilly has submitted extensive briefing fully undercutting the unfounded allegations there, and the court there has not even yet ruled on the motion.  Plaintiff's counsel cannot paint Lilly as a serial offender by pointing to nothing more than their own ill-advised and groundless accusations.

officer in the next two weeks.  Thus, Plaintiff herself has identified a less drastic sanction that would avoid the massive prejudice to Lilly were Dr. Glenmullen permitted to opine about Mr. Ali's abuse unchecked by the actual facts reflected in the police report.

## II.      Rule 37(c)(1) Sanctions Are Not Warranted

In an alternative theory, Plaintiff suggests that if sanctions are not available under 37(b), they are appropriate under Rule 37(c)(1).  But Rule 37(c)(1) does not apply here.  Rule 37(c)(1) relates to the disclosures and supplementation required by Rule 26(a) and (e).  There is no dispute here that Lilly was not required to disclose the court records under Rule 26(a) (unless Lilly intended to introduce it at trial *other than* as impeachment evidence, and in such case the disclosure would not yet be due), so the only possible application of Rule 37(c)(1) would be if Lilly's disclosure of the court records were required as *supplementation* of a response to Plaintiff's discovery requests.  *See* Fed. R. Civ. P. 26(e) ("A party who has . . . responded to an interrogatory, request for production, or request for admission [] must supplement or correct its disclosure or response . . . .").  Here, however, Lilly's response to Request for Production No. 96 was to object, noting that it would provide only records that it maintained prior to the initiation of this lawsuit, on the ground that Plaintiff declined to share costs related to records collection. *See* Reynolds Decl. Ex. 6.  On Plaintiff's motion to compel, then, this Court ordered the production of records "contemplated by Request for Production No. 96," but did not order Lilly to amend or supplement its earlier response.  *See* Wisner Decl. Ex. 2, ECF No. 101-2.  Thus, between Rules 37(b) and 37(c)(1), if either is to apply, the relevant provision is 37(b) (Failure to Comply With a Court Order) and not 37(c)(1) (Failure to Disclose, Supplement and Earlier Response, or to Admit).

Even assuming Rule 37(c)(1) applies, sanctions are not warranted because Lilly's conduct was substantially justified and harmless.  *See Southern States*, 318 F.3d at 596 ("The

language of Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: (1) when the failure to disclose is substantially justified, and (2) when the nondisclosure is harmless.") (internal quotation marks omitted).  As Lilly discussed above in connection with its arguments related to 37(b) sanctions, Lilly's allegedly improper and late disclosure of the police report is justified by Lilly's reliance on the context of the Court's order as focused exclusively on medical records obtained using authorizations signed by Plaintiff, and by the fact that Lilly only used the report for impeachment purposes.  The fact that the nondisclosure is harmless, which is a separate, independent ground for denying Rule 37(c)(1) sanctions, is demonstrated by the facts set forth above explaining why Plaintiff has suffered no prejudice.  While Lilly does not seek to repeat those arguments at length here, it bears emphasis that sanctioning Lilly and excluding the document from the case would have severe consequences at any trial.  Exclusion of the criminal complaint would allow Dr. Glenmullen to offer his unfettered "opinion" that Plaintiff caused her husband to assault her, without allowing Lilly to confront him with the public record of what actually took place.[6]  Such an outcome is not contemplated by Rule 37.

Finally, as the Fourth Circuit has recognized, the "basic purpose of Rule 37(c)(1)" is "preventing unfair surprise and prejudice to the opposing party."  *Southern States*, 318 F.3d at 596.  In addition to the fact that there is no prejudice to Ms. Ali from Lilly's disclosure of the police report at Dr. Glenmullen's deposition, as explained above, Plaintiff does not in any way suggest that she is unfairly surprised by the report.  Indeed, Plaintiff herself raised the suggestion

---

[6] This argument assumes that any of Dr. Glenmullen's testimony on these lines is admissible, which seems tenuous at best given his repeated admissions that he is playing the role of factfinder and making factual credibility determinations.  In other words, Dr. Glenmullen not only seeks to usurp the role of the jury; he seeks to mislead the jury as well.

at her deposition that the domestic violence incident was related to her use of Cymbalta, and Plaintiff's own expert offered an opinion related to the incident.  Moreover, and strikingly, Dr. Glenmullen's opinion did not change once he read the police report.  If a plaintiff's trial theory and expert's opinion do not change once a document is introduced, the document can hardly be said to have "unfairly surprised" the plaintiff.  This is all the more true when the document is produced one business day after the close of discovery, and months prior to trial.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to compel in its entirety.  In addition, given that it is now apparent that Ms. Ali has not complied with her obligations by inquiring of her divorce lawyer whether he or she has documents related to the domestic abuse incident, Lilly would respectfully ask that Ms. Ali be directed to make such inquiry and produce any responsive documents within seven days.


Dated June 10, 2015                                  Respectfully submitted,

                                                     */s/ Jeffrey Todd Bozman*
                                                     Jeffrey Todd Bozman (VSB 83679)
                                                     Michael X. Imbroscio (*pro hac vice*)
                                                     Paul W. Schmidt (*pro hac vice*)
                                                     Phyllis A. Jones (*pro hac vice*)
                                                     Brett C. Reynolds (*pro hac vice*)
                                                     COVINGTON & BURLING LLP
                                                     One CityCenter
                                                     850 Tenth Street, N.W.
                                                     Washington, DC 20003
                                                     Tel:  (202) 662-5335
                                                     Fax:  (202) 778-5335
                                                     jbozman@cov.com

                                                     *Attorneys for Defendant Eli Lilly &*
                                                     *Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of June, 2015, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Peter A. Miller
Brielle Marie Hunt
MILLER LEGAL LLC
175 S. Pantops Drive, Third Floor
Charlottesville, VA 22911
Tel:  (434) 529-6909
Fax:  (888) 830-1488
pmiller@millerlegalllc.com
bhunt@millerlegalllc.com

R. Brent Wisner (*pro hac vice*)
BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel:  (310) 207-3233
Fax:  (310) 820-7444
rbwisner@baumhedlundlaw.com

*Counsel for Plaintiffs*

Dated: June 10, 2015

By: _____/s/_____
Jeffrey T. Bozman (83679)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Tel: (202) 662-5829
Fax: (202) 778-5829
jbozman@cov.com
*Counsel for Eli Lilly and Company*