UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


GILDA HAGAN-BROWN,       )

      Plaintiff,      )

  vs.                 ) 1:14-CV-01614-AJT-JFA

ELI LILLY AND COMPANY,   ) Hon. Anthony J.

an Indiana corporation,  ) Trenga

      Defendant.     )



      The videotaped deposition of MATT KUNTZ, taken in the above-entitled cause, before Paula Ann Erickson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public, on May 6, 2015, at the Double Tree Hotel, 510 East Illinois Route 83, Mundelein, Illinois, at the approximate hour of 1:36 p.m.




Reported by: Paula A. Erickson, CSR, RPR, CLR

1



1    Effected Regulation?

2        A.    Yes.

3        Q.    And what is that?

4        A.    It's a type of supplement, so it's

5    changes being affected are -- is a mechanism by

6    which the sponsor or the applicant can modify

7    labeling without prior approval -- I'm sorry.

8    You can update and implement a change to your

9    labeling prior to receiving FDA's approval.

10       Q.    And are you familiar with the

11   circumstances in which that is permitted?

12       A.    Yes, I am.

13       Q.    What are those circumstances?

14       A.    They include different types of

15   manufacturing changes and also can include

16   safety updates to labeling.

17       Q.    Specifically are they permitted --

18   Strike that.

19             You said that there is other types of

20   applications, however, that require prior

21   approval; is that right?

22       A.    Right.

23       Q.    Are those frequently called -- What are

24   those called within the regulatory jargon?

25       A.    Prior Approval Supplement, PAS.

29

1      Q.   Okay.  And the Changes Being Effected

2    Regulations are just those called CBEs?

3      A.   CBEs.

4      Q.   And Prior Approval Supplements, what do

5    those relate to?

6      A.   Those would relate to substantial

7    modifications to labeling that aren't

8    necessarily immediately a safety-related issue

9    but sometimes they have some sort of safety

10   component but often they can also be like new

11   clinical data to support a dosing instructions

12   or supplements for new populations to be added

13   to labeling.

14     Q.   And for Prior Approval Supplements, any

15   proposed changes have to first be approved by

16   the FDA before they are implemented?

17     A.   That's correct.

18     Q.   Whereas, in a CBE change, they can be

19   implemented immediately; is that true?

20     A.   Yes.

21     Q.   They also are, of course, subject to

22   FDA review, though, correct?

23     A.   Yeah.  They are still subject to FDA

24   review and ultimately FDA approval.

402
25     Q.   Okay.  During the time that you worked

30

1    as a US Regulatory Associate for Cymbalta, did

2    you ever have an occasion to see Lilly submit a

3    CBE?

4         A.   I don't recall to be honest.  I just --

5    I don't know.

402

6         Q.   Well, during your time as a US

7    Regulatory Associate for Cymbalta, do you recall

8    Lilly submitting any Prior Approval Supplements?

9         A.   Yes.  I remember -- and, you know,

10   honestly, I wouldn't be surprised there would be

11   CBEs.  Those are just common lifecycle

12   management activities.  You know, as you have

13   more data available, you would naturally want to

14   the include it in your NDA.

402
Lack of foundation.

15        Q.   That was actually going to be my next

16   question.  Are CBEs and Prior Supplemental

17   Applications -- Prior Approval Supplements, are

18   they common as part of the regulatory

19   interfacing between Lilly and the FDA?

20            MR. TEEL:  Object to the form.  You can

21   answer.

22            THE WITNESS:  Yeah.  I mean, they would

23   be normal course of business and I would have

24   expected both types of supplements to be

25   submitted.

31

```
 1    BY MR. WISNER:

 2       Q.   Okay.  I just want to -- We are going

 3    to come back to Lilly in a second.  I just want

 4    to know a little bit more about you.  Do you

 5    have any medical training?

 6       A.   Yes.  My background is in pharmacy.

 7       Q.   Can you please explain to the jury what

 8    your educational background is?

 9       A.   Yeah.  Sure.  So I have a bachelor's

10    degree in pharmacy and then I also have what's

11    called a Pharm.D. in pharmacy which is --

12    required a couple more years of pharmacy and

13    then I have also an MBA.

14       Q.   And you say you have a bachelor's in

15    pharmacy.  Can you explain to the jury what that

16    means?  What is the area of study of pharmacy?

17       A.   So just pharmacy practice in general is

18    what your degree is in.  I didn't specialize or

19    get any further certifications, so the

20    bachelor's degree in pharmacy is a five-year

21    program that is a general pharmacy curriculum.

22       Q.   Is the purpose once you have completed

23    the degree, you can open up a pharmacy?  Is that

24    the idea?

25       A.   Sure.  You could open a pharmacy, you
```

32



1      Q.   That's okay.

2      A.   I don't really remember anything else

3   about it other than that.  I think we were -- we

4   were requested to go back and look for any

5   submissions to FDA or any sort of correspondence

6   with FDA around Discontinuation Adverse Events.

7      Q.   So it had to have been before

8   August 2012; is that fair?

9      A.   Yes.  It was.

10      Q.   Okay.  Do you recall if it was a class

11   action or a personal injury case?

12      A.   I'm sorry, I don't.

13      Q.   Do you even know what those differences

14   are?

15      A.   I do.  Sort of in the broadest sense at

16   least.

17      Q.   Okay.  Okay.  Do you recall working

18   on -- And just do you mind if I use the word

19   withdrawal or do you have a preference one way

20   or the other?

21      A.   I mean, I use the term Discontinuation

22   Adverse Events, but I don't have a preference

23   what you use.

24      Q.   I might use withdrawal.  I might use

25   discontinuation symptoms.  I will try to use

55

403
Lack of
foundation.

1    discontinuation symptoms but I might mess up so

2    I apologize if I do.

3        A.   That's fine.  Okay.

4        Q.   When -- Do you recall doing any

5    regulatory activities related to discontinuation

6    symptoms?

7        A.   With FDA, no, I don't.

8        Q.   Do you recall doing any

9    discontinuation-related issues with any

10   regulatory body?

11       A.   I don't recall.

12       Q.   Now, you said you were a US Regulatory

13   Associate.  Did you also work on regulatory

14   issues in other countries?

15       A.   Not directly, although, we would be

16   aware of any sort of ongoing interactions with

17   at least the major regulatory authorities

18   outside the US and, again, in the interest of

19   patient safety, Lilly would often try to

20   harmonize labeling, to the extent it was

21   possible, given the different regional

22   preferences and jurisdictions.

23       Q.   The -- You have mentioned the word

24   harmonize a couple of times.  Can you explain to

25   the jury what that means?

56

1        A.   Yeah.   So the -- Regulatory authorities

2    in each country have their own set of

3    requirements, regulations, and often

4    pharmaceutical companies are trying to develop

5    products to be marketed in worldwide, right, and

6    so it becomes difficult when you have to develop

7    a product under a certain set of rules in the US

8    and a different set of rules in Europe and a

9    different set of rules even for Japan and so

10   harmonization is about trying for these three

11   major regulatory regions to attempt to at least

12   standardize, to the extent possible, their

13   requirements.

14       Q.   You said these three major ones.   Are

15   those the three primary regulatory groupings

16   of -- of -- are those the three primary

17   regulatory groupings?

18       A.   Yes.

19       Q.   And, I mean, there is obviously more

20   than three countries in the world.

21       A.   Right.

22       Q.   What is your understanding of why there

23   is those three primary regulatory groupings?

24       A.   Well, those are the -- this is my

25   understanding -- is that these are the three

57



1    meaningful.

2    BY MR. WISNER:

3        Q.   You said fair and balanced.  That's

4    actually a term of art within Lilly, right?

5        A.   A term of art?  I believe, yes.

6        Q.   It's actually a goal set by Lilly in

7    its product labeling?

8        A.   I think it's a goal established.  I'm

9    not sure if it's in regulation or not but yeah.

10   It's a common vernacular in regulatory.

11       Q.   And can you explain to the jury what

12   fair and balanced means?

13       A.   Well, it would just mean that the data

14   are conveyed in a manner that is accurate, not

15   misleading, not overstating or minimizing the

16   data.  You know, it's just it's a fair and

17   balanced representation of the data.

18       Q.   During your time at Eli Lilly, did you

19   ever have an occasion where you thought that

20   Lilly was not being forthright or honest in its

21   disclosures in its US product labeling.

22       A.   No.

23       Q.   Previously I mentioned the word

24   withdrawal and discontinuation symptoms.  What

25   is your understanding of that?

64

1          MR. TEEL:  Object to the form.

2          MR. WISNER:  Let me ask that a

3    different way.  Strike that.

4    BY MR. WISNER:

402
403

5          Q.   What is -- What is discontinuation

6    symptoms, to the best of your knowledge?

7          A.   For Cymbalta specifically?

8          Q.   Precisely.  Yes.

9          A.   That if you abruptly -- well, I don't

10   even know if it's always abruptly; but if you

11   stopped Cymbalta, you may experience certain

12   adverse events around the time you discontinue

13   and I believe things like nausea, jitteriness

14   but I don't remember all the others.  There is a

15   list of them I know.

402

403

MIL

16         Q.   Sure.  And what is your understanding

17   of how frequently that withdrawal risk occurs?

18         A.   How frequently?

19         Q.   Uh-huh.

20         A.   Well, I do know that in the preparation

21   for today, I was made aware that in the European

22   label, it I think cites something like

23   45 percent or something of that nature.

24         Q.   But prior to your preparation, you

25   weren't aware of that fact?

65

402
403

1          A.    I didn't recall it, no.

2          Q.    Okay.  While you were a US Regulatory

3    Associate, was the issue -- the safety issue of

4    discontinuation symptoms something that you

5    considered to be important?

6          A.    I don't remember ever having any sort

7    of concern or issue with the way that the

8    discontinuation events were labeled in the US.

9          Q.    And during your time -- And did you

10   ever hear any discussions amongst anybody at Eli

11   Lilly that the labeling was somehow deficient

12   or -- Strike that.

402
403

13              During your time at Eli Lilly, did you

14   ever hear anyone discussing or mention to you

15   that the Cymbalta label with regards to

16   discontinuation symptoms was deficient?

402
403

17         A.    I don't recall ever hearing that.

18         Q.    Do you ever recall having any specific

19   conversation with anybody within Eli Lilly, and

20   I say this with the exclusion of any

21   conversations you may have had with an attorney,

22   but do you recall ever having any conversations

23   with anybody in Eli Lilly about the

24   discontinuation warning in the Cymbalta label

25   for the US?

66

1      A.    The only conversation I ever remember

2   was when we received notification of that --

3   that lawsuit.

402
403
4      Q.    Okay.  And following hearing about that

5   lawsuit, did you discuss the lawsuit with any

6   non-attorney individuals within Eli Lilly?

7      A.    I'm not sure.  I mean, I remember we --

8   there was a group of people that met and what I

9   recall of that meeting was that we were made

10  aware of this lawsuit and that we may be asked

11  to produce documentation and they were just

12  trying to get, "they," being Lilly legal, some

13  background.

402
403
14     Q.    Did you ever speak to Dr. Perahia about

15  discontinuation symptoms?

16     A.    No.  Not that I recall.

402
403
17     Q.    Okay.  And do you recall anybody in

18  Medical or in Regulatory ever saying to you,

19  wow, I think that this label is misleading?

20     A.    No.

21     Q.    And obviously I don't mean that in

22  quotes.  I mean, something to that effect, do

23  you ever recall having a conversation like that

24  with anybody within Eli Lilly?

25     A.    I do not recall, and I think I would

67

1    recall if something like that were brought to my

2    attention.

3         Q.   In 2012, were you ever made aware of

4    something called the QuarterWatch Report related

5    to Cymbalta?

6         A.   It sounds familiar but I'm not sure.  I

7    don't -- nothing specific for Cymbalta.

8         Q.   Okay.  I might show it to you later.  I

9    just want to know do you have any independent

10   recollection of something called a QuarterWatch

11   Report that relates to Cymbalta?  Do you have

12   any recollection of that?

13        A.   I don't.

14        Q.   Okay.  Are you familiar with the

15   Institute for Safe Medication Practices?

16        A.   I am.

17        Q.   What is that organization?

18        A.   It's a -- It's an independent business

19   that really is interested in promoting safe use

20   of -- well, safety medical practices including

21   use of medications, so they were primarily about

22   medication errors as I at least am familiar with

23   that organization but maybe more broadly in

24   terms of just safe use.

25        Q.   And did you frequently read

MIL
402
403

68

1    publications by that organization?

2         A.    No.  Not -- not that I recall.

3         Q.    Do you currently do that?

4         A.    No.

5         Q.    Okay.  Is the Institution for Safe

6    Medication Practices a respected organization?

7              MR. TEEL:  Objection to lack of

8    foundation.

9              THE WITNESS:  My understanding is it

10   is, yes.  I mean, I have certainly heard of them

11   in the -- yes.

12   BY MR. WISNER:

13        Q.    Let me rephrase the question maybe.

14             Based on your experiences within Eli

15   Lilly, was the Institute for Safe Medication

16   Practices considered a reputable organization?

17             MR. TEEL:  Objection.  Lack of

18   foundation.

19             THE WITNESS:  Yes.

20   BY MR. WISNER:

21        Q.    Do you recall ever speaking to somebody

22   about the Institute for Safe Medicine Practices?

23        A.    Now, we may have used ISMP for a

24   medication error project that I worked on or

25   maybe sort of wrapped up when I was working on

MIL
Lack of
foundation.

69

1    Zyprexa with regard to mistaking the bottle of

2    Zyprexa for a bottle of Zyrtec on the pharmacy

3    shelves and the naming similarities.  We worked

4    with ISMP to differentiate the labels in a way

5    that would help prevent that.

MIL
402

6        Q.    So based on your time at Lilly, it's

7    your understanding that Lilly would actually

8    work with ISMP on occasion?

9        A.    I am not a hundred percent certain ISMP

10   was that company, but I think so.

11       Q.    Okay.

12       A.    So my recollection is yes.

13       Q.    Do you recall ever having -- Do you

14   know who Madeline Warick might be?

15       A.    Yes.

16       Q.    Who is she?

17       A.    She is a medical -- medical -- I don't

18   know if she is a Medical Director or if she was

19   in medical.

20       Q.    Did you have any occasion to interact

21   with her while she was working at Eli Lilly with

22   regards to Cymbalta?

23       A.    I did.

24       Q.    Okay.  What was your inter -- what was

25   the nature of your working relationship with

70

1    her?

2        A.   So she was -- I think she was in a role

3    very similar to Dr. Perahia in that she would

4    provide -- she is a physician by training, and

5    she would provide medical input, oversight into

6    clinical development activities.

7        Q.   And this is a very specific question

8    but do you ever recall having a conversation

9    with her about ISMP?

10       A.   I don't, no.

11            MR. WISNER:  Let's take a short break.

12            MR. TEEL:  Sure.

13            THE VIDEOGRAPHER:  Going off the record

14   at 2:49 p.m.

15                 (Whereupon, a short recess was

16                  taken.)

17            THE VIDEOGRAPHER:  We are back on the

18   record at 2:58 p.m.

19   BY MR. WISNER:

20       Q.   Doctor -- I'm sorry, doctor.  Are you a

21   doctor?

22       A.   Yeah.  I mean, no one -- I never refer

23   to myself as a doctor, but yes.

24       Q.   But you are not a medical doctor; is

25   that right?

71

1      A.    No.

2      Q.    Okay.  I might call you doctor.  That's

3   just an instinctual thing but I apologize if --

4   Anyway, so let's get started.

5            Are you familiar with something that's

6   called a Core Data Sheet?

7      A.    Yes.

8      Q.    What is the Core Data Sheet for a

9   product?

10     A.    So Core Data Sheet is a document

11  that -- an internal document that would be

12  developed to define core safety information for

13  a product; and the intent by the Core Data

14  Sheet, again, is sort of in the interest of

15  harmonization of information across labeling

16  globally.

17     Q.    Would it be fair to say that labels are

18  generally derived from the information contained

19  on the Core Data Sheet?

20     A.    Yes.

21     Q.    And who creates the Core Data Sheet?

22     A.    Well, I think it was -- At Lilly, I

23  believe that development was owned by the Safety

24  Group at Lilly, but I am not sure about this,

25  but there would have been significant need for

72



1   BY MR. WISNER:

2       Q.   Okay.  It is true that Cymbalta is

3   approved for other indications in Europe that it

4   is not approved for in US, right?

5       A.   I'm not sure actually.

6       Q.   Have you ever heard of stress urinary

7   incontinence?

8       A.   Oh, yes.  That's right.  Yes.  Yes.

9   Uh-huh.

10      Q.   Are you familiar with that Cymbalta is

11  indicated for that treatment of that condition

12  in different countries other than the US?

13      A.   Yes.  I am now that you say that, yes.

14      Q.   Okay.  Do you recall doing any work

15  with regards to the SUI indication in the US?

16      A.   No.

17      Q.   Okay.  The next sentence says,

18  "Following abrupt or tapered discontinuation in

19  placebo-controlled trials, the following

20  symptoms occurred at 1 percent or greater and at

21  a significantly higher rate in

22  duloxetine-treated patients compared to those

23  discontinuing from placebo," and it lists

24  several symptoms there or side effects.  Do you

25  see that?

92

1        A.    I do.

2        Q.    Okay.  What is your understanding of

3    that sentence?

4        A.    What the sentence is conveying that --

5    Okay.  So, first of all, the systematic

6    evaluation was from placebo-controlled clinical

7    trials so that's the data source.  The following

8    symptoms occurred at an incidence of 1 percent

9    or more and was higher in the Cymbalta-treated

10   patients relative to placebo patients and it

11   lists these terms.

12       Q.    Now, these terms, these are MedDRA

13   terms, correct?

14       A.    I think they are MedDRA terms.  They

15   would be.

16       Q.    Okay.  So these are defined by that

17   convention that we discussed previously?

18       A.    Yes.

402
403
Lack of
foundation

19       Q.    And it says significantly higher rate.

20   Is it your understanding that that's referenced

21   to statistical significance?

22            MR. TEEL:  Objection.  Lack of

23   foundation.

24            THE WITNESS:  I don't know in this

25   case; but in common practice, that use of the

93

1    word significantly higher would connote some

2    sort of statistical inference.

3    BY MR. WISNER:

4        Q.   Well, because significantly has

5    multiple meanings, right?

6        A.   Uh-huh.

402
403
Lack of
foundation.

7        Q.   In statistics that means that the

8    numbers observed in one arm versus another arm,

9    the difference observed is not a product of

10   chance?

11            MR. TEEL:  Object to the form.

12            THE WITNESS:  I don't think I would

13   phrase it that way.

14   BY MR. WISNER:

15       Q.   Please tell me what is your

16   understanding of statistical significance.

17       A.   That there is a -- How do I phrase

18   this?  That the observation is unlikely to be,

19   maybe this is what you just said, the result of

20   chance.  Is that what you said?

21       Q.   That's what I was saying inartfully.

22       A.   That there is likely to be the result

23   of other factors basically.

24       Q.   And it also significantly has a layman

25   meaning as well, right?

94

1            MR. TEEL:  Object to the form.

2            THE WITNESS:  Yes.

3    BY MR. WISNER:

4       Q.   Do you know which one this is referring

5    to in this part of the label?

6            MR. TEEL:  Object to the form.

7            THE WITNESS:  Well, I don't know but,

8    again, typical practice would be that the

9    appearance of the word significant or

10   significantly within the USPI is referring to a

11   statistical finding.

12   BY MR. WISNER:

13      Q.   And that inference is supported by the

14   fact that it's referring to placebo-controlled

15   trials related to Cymbalta?

16      A.   That makes sense to me, yes.

17      Q.   Okay.  And then it would be an

18   essentially higher rate in the duloxetine arm of

19   those trials versus the placebo arm of those

20   trials?

21      A.   That's what this is saying.

22      Q.   Okay.  It says the following symptoms

23   occur at 1 percent or greater.  Do you

24   understand what that phrase is referring to?

25      A.   Yeah.  It just -- It's setting a

95

1    threshold essentially for the analysis that

2    based on the data that has been analyzed in this

3    case, in my view, it would appear this is a very

4    conservative approach and that you would be very

5    inclusive in the types of terms that would

6    qualify to be represented as an output of this

7    kind of analysis.

8         Q.   Okay.  And the -- So it would be fair

9    to infer then from this warning that there is a

10   1 percent or greater chance that upon

11   discontinuation, abrupt or tapered for Cymbalta,

12   a person would experience dizziness?

13        A.   No.  That's not the way this -- That's

14   not the way I would understand this.  I would

15   say this is saying that for patients who

16   discontinued duloxetine relative to those who

17   discontinued placebo in trials, there was a

18   higher incidence of these events relative to the

19   placebo arm.

20        Q.   Now, it doesn't say specifically what

21   the percentage for those incident rates were for

22   those specific side effects, correct?

23        A.   It's only saying that they occurred at

24   least 1 percent or more of the time.

25        Q.   So it's possible -- and that's

96

1    referring to these specific MedDRA terms, right?

2        A.    Right.

3        Q.    So for dizziness it's 1 percent or

4    greater?

5        A.    It's saying for -- yeah, for dizziness,

6    it occurred at least at 1 percent and at a

7    higher rate than the placebo arm.

8        Q.    Now, 1 percent or greater, that means

9    it's possible that dizziness occurred in a

10    hundred percent of patients, right?

11        A.    It's possible.    It's greater than 1

12    percent.

13        Q.    And it's also possible that it occurred

14    in 1.1 percent, right?

15        A.    That's right.

16        Q.    So based on the information contained

17    in this label, the possible range of dizziness

18    with regards to the 1 percent is somewhere

19    between 1 and a hundred percent?

20        A.    Right.

21        Q.    And nowhere in that paragraph does it

22    specifically state what the percentage is for

23    each one of those MedDRA terms?

24        A.    No.  It's not -- This paragraph is

25    listing the, for lack of a better way of

402
403
Lack of
foundation.

97

1    phrasing it, constellation of potential events

2    that could -- that were observed following

3    discontinuation.

4         Q.   And also in that paragraph, it doesn't

5    say what the likelihood that a patient would

6    experience at least one of those symptoms,

7    correct?

8         A.   No.   That's not what this is conveying.

9         Q.   Okay.   So there is no overall incident

10   rates of just general discontinuation symptoms

11   in that paragraph?

12            MR. TEEL:   Object to the form.

13            THE WITNESS:   No.   That's not what

14   this -- again, this is conveying here are the

15   kind of events that were observed, so for

16   healthcare professionals to understand, here are

17   the types of symptoms associated with

18   discontinuation events with Cymbalta.

19   BY MR. WISNER:

20        Q.   The next paragraph reads, "During the

21   marketing of other SSRIs and SNRIs (serotonin

22   and norepinephrine reuptake inhibitors), there

23   have been spontaneous reports of adverse events

24   occurring upon discontinuation of these drugs,

25   particularly when abrupt, including the

98

Lack of foundation.

1    following:"  And it lists again a bunch of

2    terms.  Do you see that?

3         A.   I do.

4         Q.   Now, I want to break that down a little

5    bit here.  It says during the marketing of other

6    SSRIs and SNRIs, what is that referring to?

7              MR. TEEL:  Objection.  Lack of

8    foundation.  You can answer.

9              THE WITNESS:  Yes.  I'm not sure I

10   guess, but my educated guess is that this is

11   referring to sort of a class kind of labeling

12   change.

13   BY MR. WISNER:

14        Q.   And it says there have been

15   "spontaneous reports of adverse events."  Is the

16   phrase "spontaneous reports of adverse events,"

17   is that a term of art?

18        A.   It is.

19        Q.   What is that?

20        A.   That's referring to postmarketing

21   Adverse Event Reports.  Those are commonly

22   referred to as Spontaneous Reports.

23        Q.   And can you explain to the jury what

24   spontaneous means in that context because I

25   think -- Could you please explain to the jury

99

1    what that means?

2         A.   Yes.  Spontaneous is a term that is

3    used to indicate that the terms were not

4    solicited.  For example, like in a clinical

5    trial setting, the clinical trial investigators

6    ask have you had any adverse events, what were

7    those, et cetera, so you are actually soliciting

8    that information; whereas, in the postmarketing

9    setting, these would be terms, events, cases

10   that would be reported to Lilly unprompted

11   without any sort of solicitation through the

12   call center or maybe through a sales rep or

13   other mechanism.

14        Q.   Okay.  Is it your under -- Okay.  Now

15   just take a second and just finish reading

16   through the rest of the section just so you have

17   a sense of what's in it.

18        A.   Okay.

19        Q.   Let me know when you are done.

20        A.   Okay.  I am finished.

21        Q.   Keep that Exhibit 1 open to that

22   section because we are going to be referencing

23   it.

24        A.   Okay.

25

100



```
 1    Committee, that's the Advisory Committee that we

 2    were just discussing?

 3         A.   That is.

 4         Q.   Okay.  And the Lilly Briefing Doc,

 5    that's the document that Lilly submitted to the

 6    FDA in anticipation of that meeting?

 7         A.   Correct.

 8         Q.   Can you just turn to page -- it's a

 9    fairly lengthy document here.

10         A.   Uh-huh.

11         Q.   It runs from CYM-01939316 through

12    CYM-01939474.  Is this the Briefing Document?

13         A.   That's what it appears to be, yes.

14         Q.   It's about 159 pages; is that right?

15         A.   That's -- yep.  Yes.

16         Q.   And that's consistent with what you

17    remember the briefing document being that was

18    submitted to the FDA?

19         A.   I actually thought it was shorter, but,

20    yes.  This sounds right.

21         Q.   Okay.  And it says down here it says,

22    "Available for public disclosure without

23    redaction," right?

24         A.   Right.

25         Q.   And that was what you were mentioning
```

195

1    before, that this was actually posted and made

2    available online?

3        A.   Right.

4                    (Whereupon, Deposition Exhibit

5                     No. 13 was marked and dated.)

6    BY MR. WISNER:

7        Q.   Okay.   Doctor, I have handed you what I

8    have marked as Exhibit 13, right?

9        A.   Right.

10       Q.   Okay.   This is an E-mail exchange.   If

11   you look down towards the bottom, there is an

12   E-mail from you to Bryan E. Boggs.   Do you see

13   that?

14       A.   I do.

15       Q.   And you said, "FYI, in case you haven't

16   seen this.   Includes dulox safety reviews."   Do

17   you see that?

18       A.   I do.

19       Q.   Okay.   And this is a document that's

20   Bates stamped CYM-02053002.   Now, Doctor --

21   Mr. Kuntz, this -- do you know what you were

22   referring to in this E-mail?

23       A.   I don't recall.   I'd have to look here.

24   Okay.   I actually still don't even know after

25   looking at it what this is exactly referring to.

402
403

196

1      Okay.

2          Q.    Well, above it Bryan Boggs says,

3      "Please convene a group to discuss this posting

4      to the FDA website."   Do you see that?

5          A.    I do.

6          Q.    And, "There are three documents I have

7      attached.   I believe we have seen the first memo

8      regarding medication errors already.   All of

9      these are dated 2007 and I don't believe pose

10     any issues we have not already addressed.   Label

11     changes suggested within the bleeding report

12     appear to have been made already.   Carole, would

13     you look at this to determine when these changes

14     were actually implemented."

15             Did I read that right?

16         A.    Yes.

17         Q.    Okay.   So it appears that you had sent

18     a link to several documents that had been posted

19     on the FDA website; is that fair?

20         A.    Uh-huh.

21                 (Whereupon, Deposition Exhibit

22                 No. 14 was marked and dated.)

23     BY MR. WISNER:

24         Q.    Okay.   I am handing you what I have

25     marked as Exhibit 14 to your deposition.   This

197

1   is one of the attachments that Bryan had to his

2   E-mail.  Do you recognize this document, Doctor?

3   Do you recognize this document?

4        A.   I don't.

5        Q.   What does it appear to be?

6        A.   Well, it's some sort of memo from --

7   from within FDA.  Medication Error Report.

8        Q.   So it's a memorandum that was prepared

9   within the FDA?

10       A.   Within the FDA, right.

11       Q.   Okay.  Do you know if this memorandum

12   was ever shared with Eli Lilly?

13       A.   Well, it was -- what I think it sure

14   looks like happened is this memo was posted.

15   This was the document that was posted to FDA's

16   website and I was on a -- basically a list serve

17   or something where FDA, you know, sends out

18   updates and that's how I found this document.

19       Q.   But do you know whether in 2007 this

20   document was given to Lilly?

21       A.   Oh, I beg your pardon.  I didn't

22   understand your -- the timing.  No.  I don't

23   know.

24       Q.   And just to clarify, the E-mail that

25   you are mentioning that you sent, that was in

198

1    2009, right?

2        A.    That's right.

3        Q.    And this memo is dated 2007?

4        A.    Right.

5        Q.    Okay.   Do you know whether or not in

6    2007 this memo was shared with Lilly?

7        A.    I don't.

8        Q.    Okay.   All right.   Well, this is -- and

9    in the Executive Summary it says, "During

10   routine postmarketing surveillance of medication

11   errors, DMETS identified a signal involving the

12   opening of Cymbalta capsules prior to

13   administration to achieve a lower dose of the

14   drug."

15            What is DMETS?

16       A.    It's the FDA Division of Medication

17   Errors and Technical Support.

18       Q.    Okay.   And it says identified a signal.

19   What is your understanding of that word

20   "signal"?

21       A.    Yeah.   That's a -- that's a term that

22   would signify that in the review of aggregated

23   safety data from the errors database, this issue

24   came up somehow in their analysis.   There is

25   lots of probably different algorithms that they

199

1    would have applied but --

2        Q.   And you have familiarity with such

3    things as signals based on your work in the

4    Pharmacovigilance Group, right?

5        A.   Yeah.   That's right.

6        Q.   Okay.   It says here that there has been

7    a signal that opening of Cymbalta capsules prior

8    to administration to achieve a lower dose of the

9    drug.

10           Do you ever recall discussing this

11   issue at Eli Lilly in your regulatory capacity?

12       A.   I don't.

13       Q.   Okay.   If you turn the page, on Page 2,

14   under Section 3, it says, "During routine

15   monitoring of medication errors, DMETS received

16   a case where a patient intentionally opened a

17   Cymbalta capsule to achieve a lower dose."

18           During your time at Eli Lilly, do you

19   recall ever having any discussions with anyone

20   at Eli Lilly about people opening up the

21   capsules to create smaller dosages for Cymbalta?

22       A.   I don't.

23       Q.   Do you recall whether or not anyone at

24   Eli Lilly took actions to update the label or

25   make changes to the US label in response to the

200

1    potential of patients opening up Cymbalta

2    capsules?

3        A.   I don't recall that.

4        Q.   Okay.  If you turn to Page 3, under

5    Section C, Wrong Technique, go down midway

6    through the paragraph.  It says, "One (n=1) case

7    involved opening 20 milligram capsules while

8    tapering off Cymbalta to avoid withdrawal

9    effects."

10           Do you see that?

11       A.   I do.

12       Q.   In this document, the FDA has

13   identified a signal and supporting that

14   identification of that signal is discussing at

15   least one incident where a patient has opened

16   the 20 milligram capsule so as to avoid

17   withdrawal effects, correct?

18       A.   That's what this report is stating.

19       Q.   Do you know whether or not Lilly took

20   any actions to update the label to warn patients

21   not to open up the 20 milligram capsules to

22   avoid withdrawal effects?

23       A.   I don't recall.

24       Q.   Do you know if Lilly, at any time,

25   considered submitting a prior approval

201

1   supplement to obtain smaller doses of Cymbalta

2   for the purposes of tapering?

3       A.   No.   I'm trying to recall if there was

4   a lower dose for the pediatric studies but I

5   just don't recall.

6       Q.   Okay.  So do you recall -- Well, do you

7   recall whether or not Lilly ever did try to

8   obtain a smaller than 20 milligram dose of

9   Cymbalta -- Sorry.  Let me rephrase that.

**402**
**403**

10          Do you recall whether or not -- Do you

11   know whether or not Lilly ever tried to obtain

12   approval for a dosage of Cymbalta less than 20

13   milligrams?

14       A.   I don't know.

**402**
**403**
**MIL**

15       Q.    Okay.   Turn to Page 6, it says, Upon --

16   under Section 3, the paragraph under

17   Section 3 -- Well, the section reads Institute

18   of Safe Medicine Practices Outpatient Medication

19   Errors.   And then underneath that it says, "Upon

20   DMETS request, the Institute for Safe Medication

21   Practices (ISMP) searched their database for

22   outpatient medication errors involving

23   Cymbalta."

24          Do you -- The ISMP, that's the

25   organization that published that QuarterWatch

202

1   report we mentioned earlier, right?

2      A.   Right.

3      Q.   And it appears here that the FDA's

4   DMETS has requested data from that organization?

5      A.   Yes.  That's what it looks like.

6      Q.   Okay.  If you turn to Page 7 under

7   Section A, Patients Attempting to Reduce or

8   Avoid Adverse Effects of Cymbalta, do you see

9   that section?

10      A.   Yes.

11      Q.   All right.  Second to the last sentence

12   in that paragraph, the first paragraph it reads,

13   "Three cases (n=3) reported patients opening the

14   capsules to create a dose of Cymbalta less than

15   20 milligrams in an attempt to reduce the

16   adverse events associated with the

17   discontinuation of Cymbalta."

18      Would it have been possible for Lilly

19   to have submitted an SNDA -- or sorry -- a

20   preapproved -- Would it have been possible for

21   Lilly to have submitted a Prior Approval

22   Supplement to obtain smaller doses --

23   approval -- to obtain approval of smaller doses

24   of Cymbalta below 20 milligrams?

25      MR. TEEL:  Objection.  Calls for

203

1    speculation.  Lack of foundation.

2          THE WITNESS:  I mean, it's not as

3    simple as just submitting that, you know,

4    request to FDA.  They would expect to have data

5    to support the use of that and you would have to

6    do quite a bit, I would think, of clinical

7    evaluation of that lower dosage form.

8    BY MR. WISNER:

9        Q.   Do you know if Lilly ever did conduct

10   clinical trials to evaluate the discontinuation

11   effects of a subtherapeutic dose below 20

12   milligrams?

13       A.   I'm not aware.

14       Q.   Okay.  Based on your understanding of

15   the CBE regulation, would Lilly have been able

16   to make changes to the Cymbalta label advising

17   patients that there was no way to taper below 20

18   milligrams?

19          MR. TEEL:  Objection.  Again, lack of

20   foundation.

21          THE WITNESS:  I'm not sure I quite

22   understand what you are asking.  Can you

23   rephrase it?

24   BY MR. WISNER:

25       Q.   Using the CBE regulation, would Lilly

204

1   have been able to make changes to the

2   discontinuation warning in the Cymbalta label

3   for the US advising patients that there was no

4   way to taper below 20 milligrams?

5       A.   Well, again, I think it could have been

6   possible is the best way to answer that

7   question.

8       Q.   Thank you.  You can't say for sure

9   right now that it would have been impossible?

10      A.   Yeah.  That's right.

11      Q.   Okay.  Do you recall ever being

12  consulted about potential changes to the

13  Japanese label for Cymbalta?

14      A.   I believe this was something we may

15  have discussed in preparation for today.  I am

16  not a hundred percent sure.

17      Q.   Okay.  Well, independent of what any

18  lawyer may have said to you --

19      A.   Right.

20      Q.   -- do you recall that your approach to

21  make changes -- your approach about the Japanese

22  label?

23      A.   I honestly, at the moment, I don't

24  remember that.  For some reason, though, there

25  is something in that -- anyways, I'm sorry.  I

205



1              C E R T I F I C A T E

2

3

4

5          I, Paula Ann Erickson, Certified
   Professional Reporter, Registered Professional
6  Reporter and Notary Public, do hereby certify:

7          That the witness in the foregoing
   deposition named was present at the time and
8  place therein specified;

9          That the said proceeding was taken before
   me as a Notary Public at the same time and place
10 and was taken down in shorthand writing by me;

11         That this transcript is a true and
   accurate transcript of my shorthand notes so
12 taken, to the best of my ability.

13         I further certify that I am neither
   counsel for nor related to or employed by any of
14 the parties to this action and that I am not a
   relative or employee of any counsel employed by
15 the parties hereto or financially interested in
   the action.

16

17

18 _____
   Paula Ann Erickson
19 Certified Shorthand Reporter
   Registered Professional Reporter
20 License No. 084-003899
   Notary Public

21

22 Dated this 15th day

23 of May, 2015.

24

25

*Ali v. Eli Lilly and Company*
*Hagan-Brown v. Eli Lilly and Company*
<u>Lilly's Objections to Plaintiffs' Deposition Designations</u>
**Matthew Kuntz**

| Lines | Objection(s) | Explanation |
|---|---|---|
| **30:25-31:5** | 402 | Mr. Kuntz's lack of recollection as to whether Lilly submitted a Changes Being Effected (CBE) label change is irrelevant.  Moreover, Lilly's CBEs related to products other than Cymbalta are irrelevant. |
| **31:6-31:14** | 402 | Mr. Kuntz's recollection that Lilly submitted Prior Approval Supplements to FDA and that he "wouldn't be surprised" if CBEs were submitted to FDA is irrelevant.  The question is not tied to Cymbalta in any way. |
| **31:15-31:25** | 402<br><br>Lack of foundation. | Mr. Kuntz's testimony that CBEs and Prior Approval Supplements were normal in Lilly's course of business is irrelevant.  Counsel's question whether such submissions are common in Lilly's interactions with FDA lacks foundation to establish that Mr. Kuntz can speak to the course of Lilly's interactions with FDA. |
| **56:4-11** | 403<br><br>Lack of foundation. | Testimony about Mr. Kuntz's recollection whether Lilly had any "regulatory activities" concerning discontinuation is unduly prejudicial.  Plaintiffs are improperly and falsely suggesting that discontinuation symptoms were not important to Lilly and that Lilly did not take any actions related to discontinuation symptoms.<br><br>Additionally, counsel's question about whether Mr. Kuntz recalls regulatory interactions related to discontinuation symptoms lacks foundation to establish that Mr. Kuntz can testify to the breadth of Lilly's interactions with FDA concerning Cymbalta. |
| **65:5-65:15** | 402<br>403 | Mr. Kuntz's on-the-spot recollection of discontinuation symptoms is irrelevant and prejudicial where discontinuation symptoms are listed in great detail in Cymbalta's label, clinical trials, and various other scientific and regulatory documents.  Counsel's "memory test" is designed to mislead the jury to believe that Lilly did not adequately research or understand the symptoms. |
| **65:16-66:1** | 402 | This designation will be subject to Lilly's |

| Lines | Objection(s) | Explanation |
|---|---|---|
| | 403<br>MIL | European Labeling MIL.  Additionally, Mr. Kuntz's on-the-spot recollection of the frequency of discontinuation symptoms is irrelevant and prejudicial where their frequency is listed in great detail in Cymbalta's label, clinical trials, and various other scientific and regulatory documents. |
| 66:2-66:8 | 402<br>403 | Mr. Kuntz's testimony concerning whether he considered discontinuation symptoms "important" is irrelevant and prejudicial.  Lilly's and its employees' views about the relative importance of specific side effects is irrelevant, and risks undue prejudice in suggesting that Lilly prioritized certain side effects or safety issues over others. |
| 66:13-66:17 | 402<br>403 | Mr. Kuntz's lack of recollection of any discussion within Lilly about possible deficiencies in the Cymbalta label concerning discontinuation is irrelevant and prejudicial.  Plaintiffs are attempting to suggest that internal Lilly discussions about the label were not important enough to the company to be remembered. |
| 66:18-67:3 | 402<br>403 | Mr. Kuntz's recollection that the only conversation he could recall concerning discontinuation symptoms was related to litigation is irrelevant and prejudicial.  Mr. Kuntz's recollection about litigation was undoubtedly jogged by his involvement in this litigation and the recency of such communications, whereas his natural lack of recollection about older communications should not be allowed to prejudice Lilly by suggesting that Lilly's only concern was with legal liability rather than patient safety. |
| 67:4-67:13 | 402<br>403 | Mr. Kuntz's recollection that the only conversation he could recall concerning discontinuation symptoms was related to litigation is irrelevant and prejudicial.  Mr. Kuntz's recollection about litigation was undoubtedly jogged by his involvement in this litigation and the recency of such communications, whereas his natural lack of recollection about older communications should not be allowed to prejudice Lilly by suggesting that Lilly's only concern was with legal liability rather than patient safety. |

| Lines | Objection(s) | Explanation |
|-------|-------------|-------------|
| **67:14-67:16** | 402<br>403 | Mr. Kuntz's lack of recollection of any discussion with Dr. Perahia about discontinuation symptoms is irrelevant and prejudicial.  Plaintiffs are attempting to suggest that internal Lilly discussions about the label were not important enough to the company to be remembered. |
| **67:17-68:2** | 402<br>403 | Mr. Kuntz's lack of recollection of any discussion within Lilly about possible deficiencies in the Cymbalta label is irrelevant and prejudicial. Plaintiffs are attempting to suggest that internal Lilly discussions about the label were not important enough to the company to be remembered. |
| **68:14-24** | MIL<br>402<br>403 | This designation will be subject to Lilly's MIL about the QuarterWatch publication.  Moreover, Mr. Kuntz's independent knowledge of and familiarity with the organization that publishes QuarterWatch is irrelevant as well as unduly prejudicial in that Mr. Kuntz's familiarity is based on the organization's work related to confusion about drug names (*see* Kuntz Dep. at 69:23-70:5) rather than their publications about labeling adequacy. |
| **69:14-19** | MIL<br><br>Lack of foundation. | This designation will be subject to Lilly's MIL about the QuarterWatch publication.<br><br>Moreover, counsel's question lacks foundation as to Mr. Kuntz's understanding about other Lilly employees' views about the Institute for Safe Medication Practices. |
| **70:6-71:9** | MIL<br>402 | This designation will be subject to Lilly's MIL about the QuarterWatch publication.<br><br>Moreover, Mr. Kuntz's lack of recollection as to whether Institute for Safe Medication Practices was the organization he recalled or whether he ever discussed it with Dr. Wohlreich is irrelevant |
| **93:19-94:2** | 402<br>403<br>Lack of foundation. | Counsel's question about whether the Cymbalta label refers to the concept of statistical significance lacks the necessary foundation of Mr. Kuntz's knowledge of statistical significance. Moreover, Mr. Kuntz's understanding of whether the label refers to statistical significance is irrelevant and prejudicial in suggesting that the language in the label connotes only a statistical |

| Lines | Objection(s) | Explanation |
|---|---|---|
| | | meaning. |
| 94:7-94:13 | 402 <br> 403 <br> Lack of foundation. | Counsel's question about the concept of statistical significance lacks the necessary foundation of Mr. Kuntz's knowledge of statistical significance. Moreover, Mr. Kuntz's understanding of whether the label refers to statistical significance is irrelevant and prejudicial in suggesting that the language in the label connotes only a statistical meaning. |
| 97:8-97:20 | 402 <br> 403 <br> Lack of foundation. | Lilly has not generally objected to questions asking Mr. Kuntz for his understanding of the contents of Cymbalta's label to the extent that they reflect the underlying text of the label and/or the underlying data.  However, questions about whether the "1% or greater" language could include effects that occurred at a rate of 100% lack foundation.  No discontinuation symptom in any study occurred at a rate even approaching 100%.  (The most common single symptom in the 2005 Perahia study occurred at a rate of 12.4%.) Plaintiffs' designation therefore falsely suggests that some symptoms may have occurred at a rate approaching 100% and is therefore irrelevant, prejudicial, misleading, and likely to cause confusion. |
| 99:4-99:12 | Lack of foundation. | Counsel's question about the "marketing of other SSRIs and SNRIs" lacks foundation to establish that Mr. Kuntz has an understanding of the marketing of other SSRIs and SNRIs. |
| 196:7-202:5 | 402 <br> 403 | Mr. Kuntz's testimony that he does not recall an email exchange regarding patients breaking open capsules is irrelevant, and risks prejudice to Lilly by implying that Lilly did not take FDA reports about patient issues seriously enough to allow Lilly employees to later recall them.  In addition, evidence regarding the opening of capsules is irrelevant and prejudicial in this case where neither Plaintiff alleges that she broke open capsules and neither prescriber instructed Plaintiff to break open capsules.  Moreover, Plaintiffs voluntarily withdrew their design defect claims. |
| 202:10-202:14 | 402 <br> 403 | Evidence regarding doses below 20mg are irrelevant and prejudicial in this case where neither Plaintiff took 20mg at any point and where neither prescriber testified that he or she |

| Lines | Objection(s) | Explanation |
|---|---|---|
| | | sought a dosage below 20mg.  Moreover, Plaintiffs voluntarily withdrew their design defect claims. |
| **202:15-204:7** | 402 403 MIL | This designation will be subject to Lilly's MIL about QuarterWatch.  In addition, evidence regarding an FDA document regarding the opening of capsules is irrelevant and prejudicial in this case where neither Plaintiff alleges that she broke open capsules and neither prescriber instructed Plaintiff to break open capsules.  Moreover, Plaintiffs voluntarily withdrew their design defect claims. |